THE DIAMOND MATCH COMPANY *v.* UNITED STATES (WINTER, WOLFF & CO., INC., PARTY IN INTEREST) (No. 5067)*

United States Court of Customs and Patent Appeals, April 11, 1962

*Lamb & Lerch (David A. Golden, of counsel) for appellant.*
*Sharrets, Paley & Carter (Howard Clare Carter, of counsel) for Party in Interest.*

[Oral argument November 14, 1961, by Mr. Golden and Mr. Carter]

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge, delivered the opinion of the court:

The basic question in this case is whether an additional duty should have been assessed by the collector under section 304(c) of the

[1] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell,* pursuant to provisions of Section 294(d), Title 28, United States Code.

Tariff Act because the imported merchandise was not itself marked with the country of origin. Appellant, an American manufacturer, protested the failure to assess such additional duty.

This appeal is from the judgment of the United States Customs Court, C.D. 2154 and C.D. 2223, denying appellee's motions to dismiss the protest and overruling the protest.

The merchandise was imported from Japan and consists of bundles of 50 wooden spatulas, each being approximately 4½ inches long, three-eighths of an inch wide, and $\frac{1}{12}$ inch thick, the bundles being held together by paper bands 1½ inches wide. Each band is marked "Made in Japan," but the individual spatulas are not marked.

The protest is by an American manufacturer of sticks for ice-cream-on-a-stick, under section 516(b) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U.S.C. 1516(b)), against the collector's liquidation without the assessment of an additional duty of 10 per centum ad valorem under section 304 of said Tariff Act, as amended (19 U.S.C. 1304). Appellant claims that the individual spatulas are the imported articles, and, since they were not individually marked with the name of the country of origin, the additional duty should have been assessed.

The pertinent provisions of the Tariff Act, as amended, are as follows, all emphasis being ours:

SEC. 516. APPEAL OR PROTEST BY AMERICAN PRODUCERS.

\*     \*     \*     \*     \*     \*     \*

(b) *Classification.*—The Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of, and the rate of duty, if any, imposed upon, designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary, setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. If the Secretary decides that the classification of, or rate of duty assessed upon, the merchandise is not correct he shall notify the collectors as to the proper classification and rate of duty and shall so inform the complainant, and such rate of duty shall be assessed upon all such merchandise entered for consumption or withdrawn from warehouse for consumption after thirty days after the date such notice to the collectors is published in the weekly Treasury Decisions. If the Secretary decides that the classification and rate of duty are correct, he shall so inform the complainant. If dissatisfied with the decision of the Secretary, the complainant may file with the Secretary, not later than thirty days after the date of such decision, notice that he desires to protest the classification of, or rate of duty assessed upon, the merchandise. Upon receipt of such notice from the complainant, the Secretary shall cause publication to be made of his decision as to the proper classification and rate of duty and of the complainant's desire to protest, and shall thereafter furnish the complainant with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at the port of entry designated by the complainant in his notice of desire to protest, as will enable the complainant to protest the

classification of, or rate of duty imposed upon, such merchandise in the liquidation of such an entry at such port. The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated. Within thirty days after the date of mailing to the complainant of notice of such liquidation, the complainant may file with the collector at such port a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper. * * *

(c) *Hearing and determination.*—A copy of every appeal and every protest filed by an American manufacturer, producer, or wholesaler under the provisions of this section *shall be mailed by the collector to the consignee or his agent within five days after the filing thereof,* and such consignee or his agent shall have the right to appear and be heard as a party in interest before the United States Customs Court. The collector shall transmit the entry and all papers and exhibits accompanying or connected therewith to the United States Customs Court for due assignment and determination of the proper value or of the proper classification and rate of duty. * * *

### SEC. 304. MARKING OF IMPORTED ARTICLES AND CONTAINERS.

(a) *Marking of Articles.*—Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner *as to indicate to an ultimate purchaser* in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—

\*     \*     \*     \*     \*     \*     \*

(3) Authorize the exception of any article from the requirements of marking if—

\*     \*     \*     \*     \*     \*     \*

(D) The marking of a container of such article will reasonably indicate the origin of such article;

\*     \*     \*     \*     \*     \*     \*

(b) *Marking of containers.*—Whenever an article is excepted under subdivision (3) of subdivision (a) of this section from the requirements of marking, the immediate container, if any, of such article, or such other container or containers of such article as may be prescribed by the Secretary of the Treasury, *shall be marked in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of such article,* subject to all provisions of this section, including the same exceptions as are applicable to articles under subdivision (3) of subsection (a). * * *

(c) *Additional duties for failure to mark.*—If at the time of importation any article (or its container, as provided in subsection (b) hereof) is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article (or its container, as provided in subsection (b) hereof) marked after importation in accordance with the requirements of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), *there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem,* which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause. * * *

Pursuant to section 304(a)(3)(D) of the tariff act as amended, the Secretary promulgated Customs Regulation 11.10 which states in part:

11.10 *Exceptions to marking requirements.*—(*a*) Articles within any specification in section 304(a)(3), Tariff Act of 1930, as amended, are hereby excepted from the requirement of marking. The marking of the container of an article will reasonably indicate the origin of such article within the meaning of section 304(a)(3)(D) if the article is imported * * * in a container which will reach the ultimate purchaser in the United States unopened. * * *

### MOTIONS TO DISMISS

Counsel for the party in interest in the two hearings of this case before the court below made three motions to dismiss the protest which were denied. They are again presented to us as "jurisdictional questions." In his words, these motions are (bracketed numbers ours):

██ My first motion is based upon the marking section, section 304 of the Tariff Act as amended, wherein the Secretary of the Treasury is authorized to except any article from the requirements of marking under certain conditions. * * *

In this case the paper strip or band has been marked, and it was the Secretary's opinion that the marking of that strip or band was sufficient to indicate the origin.

What the plaintiff [appellant here] is seeking to do in this action is to review the discretion of the Secretary in making that ruling and authorizing this exception. [The exception of section 304(a)(3)(D).] Now, under certain circumstances, perhaps, such an action might be reviewable, but this is a discretionary action and is not reviewable either in this court or in any other court under the Administrative Procedures Act. The reason for that statement is that an agency decision committed to the discretion of the agency is by statute not reviewable in the absence of a showing that the action is unreasonable, arbitrary, or capricious.

██ I * * * move to dismiss the protest on the ground that the Collector of Customs did not comply with section 516(c) which requires that a copy of every appeal and every protest filed as an American manufacturer, producer, or wholesaler under the provisions of this section shall be mailed by the collector to the consignee or his agent within five days after the filing thereof. This protest on its face was filed October 20, 1958, at 12:48 p.m., in the office of the Collector of Customs at Los Angeles. Exhibit A indicates that the party in interest was not notified prior to November 10, 1958, or a period of at least 20 days in the face of the statutory requirement of five days notice.

\*    \*    \*    \*    \*    \*    \*

██ I * * * move to dismiss this protest because it is improperly signed. Exhibit B indicates that the company is authorized to do business in the State of New York only if it signs its name "The Diamond Match Company, Incorporated" or "Inc." Exhibit C is a relinquishment of the name "The Diamond Match Company" and provides that the new name is the "Diamond Gardner Corporation." On either or both grounds the protest is improperly signed and I move that it be dismissed.

### FIRST MOTION

██ As to motion [1], we agree with the following holding of the Customs Court:

It is evident from the statute that the discretionary authority vested in the Secretary of the Treasury is whether or not to make regulations permitting the exception of articles from the marking requirements, if they meet the conditions described in the act. It is within his discretion to make or refuse to make such regulations.

\* \* \* \* \* \* \*

The issue in the instant case is *whether or not the collector properly classified the merchandise as falling within the exception* provided for in section 304(a)(3)(D) of the Tariff Act of 1930, as amended, and section 11.10(*a*) of the Customs Regulations. That question is subject to review by the courts. No judicial review of any exercise of discretionary authority by the Secretary of the Treasury is involved. [Emphasis ours.]

We agree that appellant, by filing the instant protest, was merely seeking to reverse the collector's holding that the instant spatulas were articles imported "in a container which will reach the ultimate purchaser in the United States unopened," under Customs Regulation 11.10.

We affirm the Customs Court's denial of motion [1] to dismiss.

### SECOND MOTION

As to motion [2], based on failure of the collector to mail notice in time, the Customs Court said, in part:

In the instant case, plaintiff has complied with all the requirements of section 516(b) and has thus met the conditions precedent to the filing of a valid protest. The question is whether the failure of the collector to comply strictly with the provisions of section 516(c), which take effect subsequent to the filing of the protest, can deprive plaintiff of the right of having its case heard on the merits.

It has been held that the failure on the part of Government officials to comply with mandatory regulations may not be allowed to deprive an importer of his right. *Penick & Ford (Ltd., Inc.)* v. *United States*, 12 Ct. Cust. Appls. 432, T.D. 40611; *Armour and Company* v. *United States*, 29 Cust. Ct. 296, C.D. 1482, and cases cited; *The American Distilling Company* v. *United States*, 32 Cust. Ct. 168, C.D. 1598. As a general rule, a statute which provides a time for the performance of an official duty will be construed as directory so far as time of performance is concerned, especially where the statute fixes the time simply for convenience or orderly procedure. *State ex rel. Jones* v. *Farrar*, 146 Ohio St. 467, 66 N.E. 2d 531; *Maryland Casualty Co.* v. *Cardillo*, 99 F. 2d 432; *United States* v. *Morris*, 252 F. 2d 643; 50 Am. Juris., Statutes, section 23.

\* \* \* \* \* \* \*

It is evident that the purpose of section 516(c), *supra*, is to insure that the party in interest be notified of the filing of the protest so that it may appear and be heard in the subsequent proceedings before the court. In the instant case, there is nothing to indicate nor is it claimed that the party in interest was injured by the collector's delay in sending it a copy of the protest. It has appeared and is being heard. The plaintiff herein had no control over the action or inaction of the collector nor was it at fault in any way. The statute does not restrain the doing of the act after the time limit or state any consequences if action is delayed.

We agree with the Customs Court that ▇▇▇ section 516(c) is directory so far as time of the collector's performance is concerned. As

such, the collector's failure to act within the prescribed time does not deprive plaintiff of its right to have its day in court, particularly where, as here, the party in interest has in no way been prejudiced.

The denial of appellant's second motion to dismiss is affirmed.

### THIRD MOTION

The facts surrounding appellant's motion [3], based on improper signature, were summarized by the Customs Court as follows:

Roy E. Monaco, an attorney employed by Diamond National Corporation, testified that the name of The Diamond Match Company was changed to Diamond Gardner Corporation on November 4, 1957, and that the name Diamond Gardner Corporation was changed to Diamond National Corporation on September 28, 1959.

The protest involved herein was filed on October 20, 1958, in the name of The Diamond Match Company.

Mr. Monaco explained that the first change of name came about as the result of a purchase by The Diamond Match Company, a Delaware corporation, of the assets of the Gardner Board and Carton Company, an Ohio corporation, late in 1957, and pursuant to a plan of reorganization and agreement. The second change of name resulted from the purchase by Diamond Gardner Corporation of the stock and assets of United States Printing and Lithograph Company, and pursuant to a second plan of reorganization.

The witness testified that from the time that the entity was called The Diamond Match Company, until today when it is called Diamond National Corporation, it has been the same organization, having the same policies and manufacturing the same products. He said that there were some changes in the type of stock and that, pursuant to the two plans of reorganization, the merged corporations were both represented on the slate of officers and on the Board of Directors, but that the original officers and directors of The Diamond Match Company remained throughout. No new corporation was formed involving The Diamond Match Company; it was the same corporation under a new name. No new charters were secured, but the changes were made by amendments to the original certificate of incorporation.

The issue as to this motion, simply stated, is whether the inaccurate filing of the instant protest in the name of The Diamond Match Company was such an error as to invalidate it. We believe not. We quote with approval the following remarks of the Customs Court:

The Diamond Match Company was the manufacturer of merchandise of the class or kind of the imported merchandise. The same corporation, although having a different name, is still manufacturing such merchandise. This is not a case where the real party in interest is not disclosed, as in *The Manufacturers and Producers of Goat, Sheep and Cabretta Leathers, etc.* v. *United States, American Express Co., Pellis, Inc. and Leather Trading Corp., Parties in Interest,* 21 C.C.P.A. (Customs) 591, T.D. 46996. ▄ The real party in interest here is the corporation which was at one time known as The Diamond Match Company, has been called Diamond Gardner Corporation, and is now known as Diamond National Corporation. The inaccuracy of the name used in the protest was not such as to fail to disclose the real party in interest or to mislead the importer or the Government.

Under the circumstances of this case, we find that the failure to use the correct name of the corporation in the protest does not invalidate it. The motion to dismiss is, therefore, denied.

The Customs Court's denial of this third motion to dismiss is accordingly affirmed.

### PROPER MARKING ISSUE

The question remaining for our decision is whether the imported articles have been properly marked, i.e., whether the instant paper bands on bundles of 50 spatulas, marked "Made in Japan," would, in this case, reasonably indicate the country of origin of the spatulas to "ultimate purchasers." One point is clear—the marking exception provided by section 304(a)(3)(D) of the Tariff Act as amended, and Customs Regulation 11.10, applies only when imported articles reach their "ultimate purchasers" in marked unopened containers. Appellant's position, simply stated, is that the "ultimate purchasers" of the imported articles in fact purchased them unbound and that as to these purchasers the spatulas were not properly marked.

Appellant lays great emphasis upon the testimony of Gerald Vaughan, the general manager of the Maine mills of the appellant corporation. As to the alleged pertinence of Mr. Vaughan's testimony, we quote the following passage from appellant's brief:

> Furthermore, the witness Vaughan testified that 14 per cent of *his company's* production of Ex. 13 are sold to users other than ice cream manufacturers (R. 59). Whether they are sold in bulk, cartons or banded in 50's is wholly immaterial. [Only 1.4 per cent were sold banded.] What is material is that the article of commerce is being sold to users who use them other than to hold a frozen confectionery and these users are not the ultimate purchasers in the United States. [Emphasis ours.]
>
> For example, they are used as coffee stirrers, cocktail muddlers, tongue depressors, and in arts and crafts. * * *
>
> The fact that most of the sticks imported today are sold to ice cream manufacturers is wholly immaterial to the issue at bar. There is nothing to prevent the importer from taking over the domestic business and selling articles like Ex. 11–A for uses other than to hold a frozen confectionery.

We think, however, that the uses to which the imported spatulas are in fact put is the only material consideration. What the importer might do with the imported spatulas at some future time is irrelevant. We must decide the instant case on the facts as they appear with respect to the ultimate purchasers of the imports. ▐ The uses to which the appellant corporation or its customers put spatulas similar to those imported is not evidence that any of the imported spatulas are used in a similar manner.

The court below, commenting on the actual uses of the imported spatulas, stated:

> The record in this case indicates, and plaintiff concedes, that the articles in their condition as imported are used primarily by ice cream manufacturers who

insert the sticks into frozen confectionery. There is also evidence that a small percentage [½ of one percent] of such merchandise is sold to others, mainly customers in the arts and crafts field, but, in those instances, the merchandise reaches the ultimate user directly or in kits, without the bands having been broken.

We think this conclusion is amply supported by the record. During the hearing of this case, counsel for appellant was questioned by the Customs Court on the actual uses of the imported articles as follows:

Judge Richardson: Are they sold individually?

Mr. Golden [for the American manufacturer]: Sold in bulk on some occasions.

Judge Richardson: That isn't what I mean. Are these before us sold individually?

Mr. Golden: Yes; they have been sold in bulk.

Chief Judge Oliver: That is not what Judge Richardson is asking.

Mr. Golden: Individually, no, your Honor.

*      *      *      *      *      *      *

Chief Judge Oliver: There is nothing before us about any bulk importation from Japan not so properly marked, is there? That is not before us?

Mr. Golden: Not that I know of.

The record shows that the *imported* spatulas have two, and only two, uses. The first is in the arts and crafts field. The second is in the production of ice-cream-on-a-stick where they are bought by the producers of such confections in packages of 50 to facilitate insertion of the spatulas into the machines which produce the confections.

As to the above mentioned first use of the imported spatulas, there is no evidence that any of them reached the purchasing consumer in any form other than in unbroken, marked packages of 50. We therefore affirm the Customs Court's holding that the marking of a paper band container of 50 spatulas in such cases falls within the purview of Customs Regulation 11.10 and would "reasonably indicate the origin of such articles within the meaning of section 304(a)(3)(D) * * * [because the containers] * * * will reach the ultimate purchasers in the United States unopened."

As to the second and principal use, the party in interest alleges that the producers of ice-cream-on-a-stick are the "ultimate purchasers" and that since the imported spatulas reached them in unbroken containers, the spatulas again fall within Regulation 11.10 and are properly marked. To support its position, the party in interest relies primarily on this court's decision in *United States* v. *Gibson-Thomsen Co., Inc.*, 27 CCPA 267, C.A.D. 98, for the meaning of "ultimate purchaser" in section 304. That case involved wood brush blocks and toothbrush handles with the word "Japan" die-sunk on that part of the articles where, after importation, bristles were to be inserted in order to convert the merchandise into hairbrushes and toothbrushes. The question there before this court was whether section 304(a)(2) of the Tariff Act of 1930, as amended, and the per-

## 60

tinent Customs Regulation required the importer to mark the brush block and handles in such a manner that these markings would be visible to a retail purchaser of a finished wooden brush or toothbrush. The collector considered such a purchaser to be the "ultimate purchaser" of the imported articles. This court disagreed, saying (27 CCPA 273):

We find nothing in the statute nor in its legislative history to warrant a holding that the Congress intended to require that an imported article, which is to be used in the United States as material in the manufacture of a new article having a new name, character, and use, and which, when so used, becomes an integral part of the new article, be so marked as to indicate to the retail purchaser of the new article that such imported article or material was produced in a foreign country.

Appellant contends, however, that the *Gibson-Thomsen* case is not applicable here because ice-cream-on-a-stick is not a manufacture and that "the combination of an ice cream stick with an ice cream confection does not result in a 'new article having a new name, character and use'." In support of this contention, appellant says:

The toothbrush handles and wood brush blocks involved in the *Gibson-Thomsen* case, *supra*, were clearly raw materials. They had no possible end use in and of themselves. They are only usable when manufactured into toothbrushes.

Ice cream sticks, on the other hand, are not mere raw materials, but are end products which have many practical end uses, i.e., as stirrers in bars and restaurants, as tongue depressors and in the arts and crafts to build articles by the ultimate consumer.

We think these distinctions are without legal significance. Whatever may be the totality of "practical end uses" for wood spatulas, the fact is that the imported spatulas, when used by ice-cream-on-a-stick producers, are used solely as component parts in the production of the confections. After such use, the spatulas clearly lose their identities, in a tariff sense, as independently usable spatulas. We agree with the Customs Court that

In the instant case, more is done than merely combining sticks with ice cream by inserting them therein. According to the record, after the sticks are inserted in the soft or liquid ice cream mixture, the whole unit is frozen so that the stick is firmly set into the mixture, and cannot be removed without destroying the product. Thus, the stick forms an integral part of the product without which it could not function as ice-cream-on-a-stick. This is a new product, having a new name, character, and use.

We have no doubt that, as to spatulas so used, the "ultimate purchasers" of the imported articles are the producers of the ice cream confections. As they receive them, the spatulas are marked, on their containers with the country of origin in accordance with the law and hence are not subject to additional duty.

The decision of the Customs Court is *affirmed*.

MARTIN, J., dissenting:

I dissent from the majority opinion for the following reasons.[2] I believe that the section pertaining to the marking of imported merchandise was passed by the Congress so that every American citizen, the ultimate consumer, will be given the opportunity, *wherever possible*, to ascertain the country of origin of every imported item sold in this country so that he can determine for himself whether he desires to purchase such item.

It is common knowledge that many consumers prefer to "buy American" or will not purchase merchandise originating in a particular country for one reason or another. These are the "ultimate purchasers" for whom the law was passed. Because of this attitude of these consumers, the domestic manufacturer's competitive position is improved and he has the right to protect this position. This is the reason that appellant filed the protest and brought this action.

Besides situations similar to that of the case at bar there is another set of circumstances which demonstrates very readily that Congress intended the "ultimate purchaser" to be the ultimate consumer *whenever possible*. I refer to the situation where an importer endeavors to pawn off domestic goods on the public as if they originated in a foreign country, by placing the domestic merchandise in an imported bottle or box. A case in point would be where a domestic perfume manufacturer uses bottles manufactured in France stamped "made in France" thereby giving the impression that the perfume itself originated there. There can be no doubt in this situation that it would serve no purpose to mark the container in which such bottles were imported "Bottles made in France." In this instance what would be accomplished if the perfume manufacturer was declared to be the "ultimate purchaser"?

Congress has excepted an imported article from being marked under certain circumstances, such as when it is impracticable to mark it. This court has added another exception, i.e. when the imported article is used as material to produce a new article in the United States.[3] However, it seems to me, if I am correct about the motivating force behind this law, the exceptions should be invoked only when there is a clear indication that such action is warranted under the statute or when it is clear that a *new article* has been manufactured. Such clear indication is not present here in either situation. Furthermore, I do not think it was the intent of Congress that the container marking exception should be invoked merely because its application is possible.

---

[2] In this dissent I shall consider only the primary use of these sticks in the United States, as sticks for ice cream. However, I believe the sticks should be marked when the other uses of record are made of them.

[3] This decision permits marking the container under the "new article doctrine" because "the ultimate purchaser" is considered to be the domestic manufacturer. See *United States* v. *Gibson-Thomsen Co., Inc.,* 27 CCPA 267, C.A.D. 98.

Congress did not intend alternative procedures, i.e. either mark the article or the container at the whim of the importer.

The legislation itself clearly indicates that Congress intended that the imported article itself be marked and any other procedure was an exception to that requirement. Section (b) of 19 U.S.C. 1304 reads in part:

> Whenever *an article is excepted under subdivision (3) of subsection (a) of this section from the requirements of marking,* the immediate container * * * of such article * * * shall be marked * * *. [Emphasis added.] [4]

Since there is no doubt that the imported individual stick is capable of being marked [5] and a very great doubt exists that a new article has been manufactured in the United States in this instance, it appears to me that to endeavor to apply the container marking provision is unwarranted and, if successful, would unnecessarily thwart the will of Congress that the ultimate consumer be apprised of the fact that the sticks were made in Japan.

It should be noted that the Secretary of the Treasury believed that exception (D), the container marking provision, required limitation so that this exception would be interpreted to carry out the intent of Congress rather than impede it. Customs Regulation 11.10 states:

> 11.10 *Exceptions to marking requirements.*—(a) Articles within any specification in section 304(a)(3), Tariff Act of 1930, as amended, are hereby excepted from the requirement of marking. *The marking of the container of an article will reasonably indicate the origin of such article within the meaning of section 304(a)(3)(D) if the article is imported * * * in a container which will reach the ultimate purchaser in the United States unopened.* * * * [Emphasis added.]

In other words, unless the container will reach the "ultimate purchaser" unopened the exception cannot be invoked. If I am correct in properly identifying the "ultimate purchaser" in this situation, then this exception cannot be invoked here because the container will not "reach the ultimate purchaser [the ice cream consumer] in the United States unopened."

It is difficult for me to understand how the will of Congress can be fulfilled if a manufacturer of the ice-cream-on-a-stick is considered to be the ultimate purchaser. This manufacturer, who is in business, I assume, to make a profit, will endeavor to purchase sup-

---

[4] It should be remembered that exceptions to general provisions must be strictly construed. *United States* v. *McElwain et al.,* 272 U.S. 633, 639.

[5] It has been argued that if the stick was marked, the purchaser might think the ice cream itself was made in Japan. Of course this could be avoided by marking "Stick made in Japan." Others have contended that such marking could be obscured or covered by placing the marked portion in the ice cream. However, such action would constitute violation of the penal section of this provisions. 19 U.S.C. 1304(e), which states:

> (e) If any person shall, with intent to conceal the information given thereby or contained therein, deface, destroy, remove, alter, cover, obscure, or obliterate any mark required under the provisions of this chapter, he shall, upon conviction, be fined not more $5,000 or imprisoned not more than one year, or both. * * *

plies as cheaply as possible and, if the imported sticks are less expensive than the domestic ones, he most likely will purchase the former. If he will benefit by not disclosing to the public the origin of the imported sticks he will not do so, so long as he is not penalized. It is obvious that the penal section was passed with this in mind. Therefore, if such a manufacturer is held to be the ultimate purchaser the whole purpose of the legislation could be nullified in a situation where the sticks can readily be marked.

So much for the section itself as it applies to the merchandise involved. I come now to the discussion of *United States* v. *Gibson-Thomsen Co., Inc.*, *supra*, upon which the majority relies so heavily to support its position that the ultimate purchaser is the manufacturer of the ice-cream-on-a-stick and hence exception (D) applies. Clearly the facts in that case are distinguishable from those at bar. There this court held that the imported wooden handles became integrated permanently with the bristles to form an entirely new article, a toothbrush or hair brush. Here the article itself is ice cream and the sticks are used as a convenient means for eating it. The sticks are not integral parts of the article itself any more than imported cans for domestic beer or imported bottles or drums after they have been filled with a domestic liquid. The sticks, like beer cans, are discarded when they have fulfilled their purpose. Also processing is required in both situations. This court in the *Gibson-Thomsen* case distinguished bottles and drums from wooden handles to be made into brushes. The reason for this distinction is obvious. As previously stated, if the importation is merely the material which is used in the United States in the manufacture of a *new article*, the manufacturer is considered the ultimate purchaser of the imported material. However, where the imported article is merely *combined* with a domestic article and does not lose its identity, the ultimate purchaser is not the one who merely combines the two articles. In this instance I believe we have the combination of two distinct articles and the imported one does not lose its identity and can readily be marked as to its country of origin so that the will of Congress could be fulfilled. I believe it should be so marked.