**PHILIPP BROTHERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 84–4–00528.

United States Court of
International Trade.

Feb. 14, 1986.

---

Donohue & Donohue, James A. Geraghty, Margaret R. Polito, New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Elizabeth C. Seastrum, (Andrea E. Migdal, of counsel), Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

RESTANI, Judge:

This matter is before the court on plaintiff's challenge of the final determination in a section 751 annual review of a countervailing duty (CVD) order. Tariff Act of 1930, as amended, 19 U.S.C. § 1675 (1982 & West Supp.1985); 49 Fed.Reg. 9,923 (1984). On April 4, 1980, the International Trade Administration (ITA) of the United States Department of Commerce published a CVD order, pursuant to 19 U.S.C. § 1303 (1982), on pig iron from Brazil.[1] 45 Fed.Reg. 23,-045 (1980). The excessive remission of Brazil's value-added Industrial Products Tax (IPI) was among the subsidies found to be provided by the government of Brazil for exports of Brazilian pig iron. Prior to issuance of the CVD order by ITA, however, the Brazilian government announced that this excess credit would be eliminated as of December 12, 1979, and the subsidy determination was reduced accordingly. Consistent with the conclusion of the Treasury Department, ITA's estimated duties for the eight largest exporters were calculated on a company-specific, rather than average, basis reflecting the varying bene-

---

1. The CVD investigation was initially conducted by the United States Department of Treasury as the administering authority under 19 U.S.C. § 1303, prior to enactment of the Trade Agreements Act of 1979. After issuance of the final affirmative determination by Treasury, the Trade Agreements Act of 1979 became effective and authority to issue CVD orders was transferred from Treasury to Commerce. Subsequent proceedings were governed by the transition rules of the Trade Agreements Act of 1979. Public L. No. 96–39, § 102, 93 Stat. 144.

fits received by each of the companies from the subsidies. In both its first and second annual reviews, however, ITA switched from its company-specific CVD assessment to an average assessment, which thereby required each pig iron exporter to pay countervailing duties at the same rate. In addition, in its second annual review, ITA announced that it had learned that although the Brazilian government had begun to impose a tax to offset the IPI export credit premium, collection of that tax had been delayed. ITA concluded that the delay in collection conferred a benefit akin to an interest free loan to Brazilian pig iron exporters. ITA calculated the *ad valorem* benefit of the delay in collection of the offset tax and increased the aggregate countervailing duty rate accordingly in its second annual review, covering entries made during 1980.

Only plaintiff's challenge of ITA's second annual review is before the court. Plaintiff alleges that the decision to assess countervailing duties on an average basis rather than a company-specific basis was unlawful. In addition, plaintiff asserts that ITA's second annual review was untimely and therefore contrary to law. Further, plaintiff claims that adjustment of the CVD rate due to the lag in collection of the IPI export credit premium offset tax constituted the imposition of a CVD without first establishing that such delay is in fact a subsidy. Finally, plaintiff contends that even if this delay in tax collection constitutes a subsidy, ITA's calculation of the IPI export credit subsidy based on credits earned rather than received, required it to similarly consider the date of offset tax assessment rather than collection.

## I. Participation in Comment Period as Jurisdictional Prerequisite

Defendant raises the same jurisdictional defense, failure to exhaust administrative remedies, to plaintiff's first two claims. Specifically, defendant maintains that plaintiff was required to participate in the comment period following the issuance of the section 751 preliminary review before seeking judicial relief. Under section 751, as it read during the period in question, ITA was required to conduct annual reviews of each CVD order.[2] Accordingly, the agency published its notice of "Preliminary Results of Administrative Review" concerning Brazilian pig iron. 48 Fed.Reg. 54,091 (1983). This notice invited interested parties to comment on the preliminary results. *Id.* Written comments could be submitted within thirty days of the date of publication of the notice (November 30, 1983). Parties could also "request disclosure and/or a hearing" within ten days of publication. *Id.* at 54,093. The first question confronting the court is whether plaintiff was required to submit comments or request a hearing before raising issues in this court that could have been raised before the agency.

"The general rule is that 'administrative exhaustion of remedies is required before a litigant will be allowed to raise a claim via a civil action.'" *Allen v. Regan*, 9 C.I.T. ——, Slip Op. 85–126 at 6 (Dec. 10, 1985) (quoting *Rhone Poulenc, S.A. v. United*

---

**2.** 19 U.S.C. § 1675(a) reads as follows:

**Administrative review of determinations**

**(a) Periodic review of amount of duty.—**

(1) **In general.**—At least once during each 12-month period beginning on the anniversary of the date of publication of a countervailing duty order ... the administering authority, [if a request for such a review has been received and] after publication of notice of such review in the Federal Register, shall—

(A) review and determine the amount of any net subsidy,

(B) review, and determine (in accordance with paragraph (2) ), the amount of any antidumping duty, and

(C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any net subsidy or margin of sales at less than fair value involved in the agreement,

and shall publish the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed in the Federal Register.

(Bracketed material was added by amendment in 1984.)

*States,* 7 C.I.T. ——, 583 F.Supp. 607, 609 (1984), citing *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952)). Procedures governing section 751 reviews are set out in 19 C.F.R. § 355.41 (1983), promulgated by the Secretary of the Treasury. Section 355.41(d) specifically lists the various procedures that ITA set forth in its preliminary order. Thus, to have exhausted its administrative remedies, plaintiff should have either requested a hearing or offered written comments on the proposed changes. Under normal circumstances, only then would it be able to raise those issues at the judicial level. *L.A. Tucker Truck Lines,* 344 U.S. at 37, 73 S.Ct. at 69 ("as a general rule ... courts should not topple over administrative decisions unless the administrative body not only had erred, but has erred against objection made at the time appropriate under its practice"); *Unemployment Compensation Commission v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946) ("[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented"); *Meglio v. Merit Systems Protection Board,* 758 F.2d 1576, 1577–78 (Fed.Cir. 1984) (failure to raise claim before administrative body constitutes effective waiver of right to contest).

■ A plaintiff's failure to exhaust its administrative remedies is not always fatal to its case, however. This court is not required by statute to consider full exhaustion of administrative remedies a jurisdictional prerequisite to an action contesting the final determination of an annual review of a countervailing duty order. Instead, in this situation, the court "shall, *where appropriate,* require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d) (1982) (emphasis added). *See Rhone Poulenc,* 7 C.I.T. at ——, 583 F.Supp. at 611 (exhaustion required "where appropriate" if plaintiff satisfies prerequisite of participation under 19 U.S.C. § 1516a(a)(2) ).[3]

■ With regard to the average versus company-specific CVD rates issue, plaintiff contends that it should be excused from the requirement of raising the issue at the administrative level because the law, as interpreted by this court just after publication of the preliminary section 751 review, prohibited ITA from retroactively assessing countervailing duties. The day after the section 751 preliminary review was published, this court issued its decision in *Ambassador Division of Florsheim Shoe Co. v. United States,* 6 C.I.T. ——, 577 F.Supp. 1016 (1983), *rev'd,* 748 F.2d 1560 (Fed.Cir.1984). In *Florsheim,* this court interpreted section 751 and held that ITA could not, pursuant to a periodic review, suspend liquidation of entries and impose a retroactive assessment of countervailing duties. Plaintiff's position is that it was entitled to rely on the expectation that Commerce would act in accordance with this court's decision in *Florsheim.* Pursuant to *Florsheim* (prior to reversal), Commerce could not have switched from the lower company-specific rates to the higher average assessment because to do so would be the retroactive assessment of countervailing duties which was barred by *Florsheim.* Defendant contended at oral argument that although *Florsheim* was arguably favorable to plaintiff, the case did not specifically address the company-specific versus average issue and was, therefore, distinguishable from plaintiff's case. Plaintiff was, according to defendant, obliged to bring to ITA's attention the applicability of that decision to plaintiff's case and, presumably, to raise any additional objections to the assessment of CVDs on an average basis.

The court cannot agree with defendant's argument. It is true that *Florsheim* did not specifically address the company-specific versus average issue. The holding of that case, however, invalidating the suspension of liquidation and retroactive assessment of countervailing duties pursuant to a section 751 review, clearly would have con-

---

**3.** There is no dispute that plaintiff "participated" in the proceedings below.

trolled the case at bar had it not been reversed subsequently. Although the *Florsheim* decision was not final, in the sense that time for appeal had not run, it was sufficiently final to constitute applicable precedent. *See Rhone Poulenc* 7 C.I.T. at ——, 583 F.Supp. at 612 (an appealed decision remains valuable precedent until reversed). In the final results of the section 751 review in question, ITA did not deny the applicability of the lower court decision in *Florsheim*. Rather, ITA responded to a comment of the Brazilian government noting the applicability of *Florsheim* by stating, "[t]he Department [of Commerce] has appealed the *Florsheim* decision. The Department believes that its practice of retroactive collection [of CVDs] is correct and will continue to operate on that belief pending the outcome of the appeal." 49 Fed.Reg. at 9,924. Thus, this is a situation in which ITA refused to apply the clearly applicable precedent and not one in which a party failed to argue for adherence to possibly distinguishable case law.[4] Even in such a situation, plaintiff might have the burden of presenting alternative arguments to ITA prior to raising those arguments to this court, but further aggravating factors exist. Plaintiff's argument to this court challenging the legality of ITA's switch to a company-specific assessment of CVDs is based on facts available only in the confidential administrative record. The deadline for seeking access to the confidential administrative record had passed by the time plaintiff received notice of the deadline.[5] Nonetheless, absent the situation created by ITA's disregard of the lower court opinion in *Florsheim*, which plaintiff had no reason to anticipate, plaintiff would not be relieved of the obligation to seek additional time to obtain access to the confidential administrative record, which it needed to make presentation of alternative arguments possible. Separately, neither of these factors necessarily tips the scale against requiring exhaustion of administrative remedies, but the result is clear if they are weighed together. The court considers it inappropriate to require plaintiff, under the doctrine of exhaustion of administrative remedies, to argue to ITA for adherence to clearly applicable precedent, to anticipate disregard of the precedent and to then raise alternative arguments to the agency, the basis for which plaintiff could not know. Thus, plaintiff is not barred by a failure to exhaust its administrative remedies and its claim that ITA's switch to an assessment of CVDs on an average, rather than company-specific, basis is properly before this court. The court must, therefore, determine whether this decision of ITA in the section 751 review that is before this court is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982).

## II. *Company-Specific Versus Average CVD Assessment*

■ As noted, although ITA calculated estimated CVDs on a company-specific basis in its CVD order, it then switched to an average assessment in the section 751 reviews. Plaintiff contends that ITA's fail-

---

**4.** It should be noted that India, the country under investigation in *Florsheim,* was not a signatory to the GATT Subsidies Code while Brazil is an "agreement country." The procedures governing CVD determinations are more favorable to agreement countries, *see* 19 U.S.C. § 1671(a) (1982 & West Supp.1985) (requiring material injury determination for agreement countries as prerequisite to imposition of CVDs), however, and thus it would not make sense to say that the lower court ruling in *Florsheim* was distinguishable on this basis.

**5.** The "preliminary results" of the section 751 review were published in the federal register on November 30, 1983, 48 Fed.Reg. 54,091 (1985), and the deadline for requesting confidential information was stated therein to be just 5 days later, December 5, 1983. Generally, notice by publication in the federal register is appropriate for all purposes, *see, e.g.,* 19 C.F.R. § 355.-28(a)(4) (1983), but here the section 751 annual review was already months late at the time these preliminary results were published. *See* 19 U.S.C. § 1675 (1982 & West Supp.1985). Under these circumstances, ITA appropriately undertook to notify the parties directly. This notification was sent to plaintiff by letter dated December 6, 1983, by which time the December 5, 1983, deadline for requesting confidential information had already passed.

ure to explain its departure from the company-specific deposit rates necessarily determines that ITA's decision was unlawful. Defendant responds that although ITA is required, in conducting preliminary and final countervailing duty determinations, to state any material differences in the benefits received by separate enterprises, 19 C.F.R. §§ 355.28(a)(3) and 355.33(f) (1983), no such requirement exists for section 751 reviews.[6] In addition, defendant claims that, even if company-specific assessments might be required in particular instances, the decision to use an average assessment in the case at bar was imminently reasonable because of the lack of material differences in the benefits received by various companies. Finally, defendant argues that to require company-specific assessments in section 751 reviews would impose an unfair burden on ITA.

To begin, the fact that 19 C.F.R. §§ 355.28(a)(3) and 355.33(f) may be inapplicable by their terms to the form of final published results of section 751 reviews does not enable ITA to disregard these regulations in conducting such reviews. Sections 355.28(a)(3) and 355.33(f) unquestionably require company-specific benefits to be stated in preliminary and final determinations made prior to a section 751 review if companies receive materially different benefits. It cannot have been intended that ITA, once having made such a finding, simply ignore any material differences in benefits received in conducting a section 751 review. In conducting such a review, ITA is specifically required to publish "a revised Countervailing Duty Order, including any revised bases for the assessment of duties on the merchandise." 19 C.F.R. § 355.41(d) (1983). The switch from company-specific deposit rates to an average assessment of CVDs falls within this requirement. Although the fact that an average assessment would be used was stated in both the preliminary and final results of the section 751 review, there is no indication on the record of ITA's justification for this change to an average assessment. Whether or not ITA's initial use of company-specific CVD deposit rates was based on a finding of "material" differences in benefits received, ITA evidently concluded that the differences were sufficiently large to warrant company-specific deposit rates.[7] To then

---

**6.** 19 C.F.R. § 355.28 contains guidelines governing the issuance of preliminary determinations. Subsection (a)(3) provides that "[i]f separate enterprises have received materially different benefits, such differences shall also be estimated and stated." 19 C.F.R. § 355.28(a)(3) (1983). Similarly, 19 C.F.R. § 355.33(f) contains guidelines governing the issuance of final determinations. Subsection (f) specifies that "[i]f separate enterprises have received materially different benefits, such differences shall be estimated and stated." 19 C.F.R. § 355.33(f) (1983).

Although the term "stated" is not defined, the logical inference would be that company-specific deposits rates are to be used where such material differences are found. *See* Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, *Portland Hydraulic Cement and Cement Clinker From Mexico*, 48 Fed.Reg. 43,063, 43,068 and 69 (1983) (citing § 355.33(f) and imposing company-specific deposit rates where material differences were found to exist).

**7.** It should be noted that regulations proposed by ITA would clarify the magnitude of differences in subsidies among companies that would mandate company-specific CVD deposit rates following final affirmative determinations and company-specific CVD assessments in § 751 reviews. Proposed regulations 19 C.F.R. §§ 355.22(d)(2) and (3) state that in conducting a section 751 review,

> (2) If the Secretary decides that an individual (including government-owned) producer or exporter received a significantly different net subsidy during the period, the Secretary will state in the final results an individual rate for that person, and that rate will be the basis for the assessment of countervailing duties and, except as provided in paragraph (c)(7)(iii) of this section, the cash deposit of estimated countervailing duties for that person.
> (3) A significant differential is a difference of the greater of at least 10 percentage points, or 25 percent, from the weighted-average net subsidy calculated on a country-wide basis.

50 Fed.Reg. 24,207, 24,226 (1985).

Proposed regulation 19 C.F.R. § 355.20(d)(3) contains the same definition of a "significant differential" in the context of final CVD determinations. 50 Fed.Reg. at 24,225. This definition of a "significant differential" would apparently have mandated company-specific deposit rates and CVD assessments here for certain companies in the final CVD determination and the § 751 review respectively. Although obviously not dispositive here, this fact is instructive as to the significance of the differences in bene-

ignore such differences in the section 751 review without explanation on the record (*e.g.*, of an unavailability of the requisite data or of a discovery that such differences, in fact, do not exist) results, as here, in a determination made contrary to law.[8] " '[T]he failure of an administrative agency to articulate the reasons for a particular decision makes meaningful review of that decision impossible.' " [9] *SCM Corp. v. United States*, 84 Cust.Ct. 227, 233, C.R.D. 80–2 (1980) (quoting *Public Media Center v. FCC*, 587 F.2d 1322, 1331–32 (D.C.Cir. 1978), quoting *American Smelting & Refining Co. v. FPC*, 494 F.2d 925, 945 (D.C. Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974)).

### III. *Deemed Liquidation*

■ Plaintiff's second claim is that the merchandise at issue should be liquidated by operation of law at the rate specified by plaintiff when it was entered because Customs failed to complete the annual review within the statutory deadline of twelve months. Plaintiff's argument is as follows: An entry of merchandise not liquidated within one year from the entry of such merchandise is deemed liquidated at the rate of duty, value, quantity, and amount of duties specified by the importer at the time of entry unless the Secretary extends the time for liquidation. 19 U.S.C. § 1504(a) (1982 & West Supp.1985). One of the situations in which extension is allowed is when liquidation is suspended as required by statute. 19 U.S.C. § 1504(b)(2) (1982 & West Supp.1985). Plaintiff argues that although liquidation in this case was originally suspended for the periodic review, *Ambassador Division of Florsheim Shoe v. United States*, 748 F.2d 1560, 1563 (Fed.Cir.1984), the suspension automatically terminated at the end of the twelve-month period allowed for the review. Once a suspension terminates, an entry is liquidated within ninety days. 19 U.S.C. § 1504(d) (1982 & West Supp.1985). Plaintiff contends that pursuant to this scheme, the merchandise was liquidated on July 4, 1983.

In several other contexts courts have recognized that statutory time periods are directory, as opposed to mandatory, when no restraint is affirmatively imposed on the doing of the act after the time specified and no adverse consequences are imposed for the delay. *Usery v. Whitin Machine Works, Inc.*, 554 F.2d 498, 501 (1st Cir. 1977) (Secretary of Labor's decision on petition for trade adjustment assistance); *Fort Worth National Corp. v. Federal Savings & Loan Insurance Corp.*, 469 F.2d 47, 58 (5th Cir.1972) (Federal Savings and Loan Insurance Corp. decision on application for acquisition of institution insured by the Corp.); *Katunich v. Donovan*, 7 C.I.T. ——, 594 F.Supp. 744, 748–50 (1984) (same program as *Usery*); *Alberta Gas Chemicals, Inc. v. United States*, 1 C.I.T. 312, 315–16, 515 F.Supp. 780, 785 (1981) (Treasury determination regarding dumping complaint)[10]; *Diamond Match Co. v. Unit-*

---

fits received in the case at bar, particularly in light of ITA's stated purpose, in proposing this definition, of decreasing instances in which company-specific CVD rates would be required. *Id.* at 24,211–12.

**8.** From the administrative record it is evident that ITA, in conducting the 1981 § 751 review, compiled company-specific data for 1981 for the eight largest exporters to the United States of Brazilian pig iron. Thus, it cannot be argued that ITA lacked the relevant company-specific data for these companies.

**9.** The parties did not brief an issue which relates to the change in duties assessed, that is ITA's inclusion in the average CVD assessment of the "subsidy" received by Cimetal. The al-

leged subsidy received by Cimetal was apparently based largely on its bankruptcy during 1981 and its consequent failure to repay government loans. The size of this alleged subsidy apparently skewed the average assessment. The court makes no determination as to the reasonableness of ITA's apparent conclusion that the failure to repay government loans due to bankruptcy is, in fact, a countervailable subsidy.

**10.** "Although the legislative history cited by plaintiff shows clearly that Congress desired the expeditious handling of [these cases,] 'there is nothing in the statute which in any way suggests that the time limitation was designed to be jurisdictional.' " *Alberta Gas*, 1 C.I.T. at 316, 515 F.Supp. at 785 (quoting *Usery*, 554 F.2d at 501).

*ed States,* 44 Cust.Ct. 67, 74–75, 181 F.Supp. 952, 959 (1960) (notification by Customs collector of filing of protest), *aff'd,* 49 C.C.P.A. 52, C.A.D. 796 (1962). As discussed above, the statute in question in this case does not purport to restrain ITA from acting after the twelve-month period has passed. The more problematic issue is whether the statute imposes the adverse consequence for the delay, which plaintiff seeks to have imposed on ITA. The Court of Appeals for the Federal Circuit has noted "that both § 1504 and the provisions respecting countervailing duties, such as § 1675(a), were enacted as in *pari materia,* both being amendments to ... the Tariff Act of 1930, and therefore a legislative intent to have them work harmoniously together, and for neither to frustrate the other ... is very much to be inferred." *Florshiem,* 748 F.2d at 1565 (discussing 19 U.S.C. §§ 1504 and 1675(a) ). Although these two provisions are to be read in tandem, and the suspension is to be implied, there is nothing in the statute or legislative history that compels the conclusion that the implied suspension automatically terminates at the close of the twelve-month period specified in section 751. Thus, in this situation, the court is unable to conclude that the statute imposes a penalty of deemed liquidation for the delay. Although ITA's failure to comply with the statutory time limit is not condoned by this court, this failure to act in a timely manner did not deprive ITA of jurisdiction to complete the section 751 review.[11]

## IV. *Lag in Collection of Offset Tax*

Plaintiff alleges that ITA's treatment of the lag time in collection of the IPI export credit offset tax is not supported by substantial evidence and is not in accordance with law. Plaintiff contends that the bene-

fit conferred due to the lag time between Brazil's assessment and collection of the tax is not a countervailable subsidy. In the alternative, plaintiff claims that even if this is a countervailable subsidy, ITA was not justified in imposing a CVD for this gap in collection. The CVD assessment on the IPI export credit program was based on the time at which credits were earned rather than received. To be consistent with the assessment of CVDs based on credits earned rather than received, plaintiff argues that the impact of the offset tax should be determined from the date the taxes were assessed rather than collected. Defendant offers two alternative arguments to counter plaintiff's contentions here.

■ Defendant first argues that plaintiff is barred from a judicial challenge to the assessment of CVDs based on export credits earned rather than credits received because plaintiff failed to raise this issue at the administrative level. ITA did not take account of this lag in offset tax collection, however, until its final decision concerning the section 751 review under consideration. Therefore, insofar as plaintiff argues for consistency in ITA's assessment of CVDs, there was no opportunity to raise the issue at the administrative level. Thus, even if the *Florsheim* decision, and other events discussed previously, had not intervened, plaintiff would not be barred from raising this issue before the court.

■ In the alternative, defendant asserts that its treatment of the lag in tax collection was within ITA's statutorily prescribed discretion under 19 U.S.C. § 1677(6)(C) (1982) to calculate an allowance for taxes imposed by the foreign government to offset a subsidy.[12] Thus, defendant charac-

---

**11.** In view of the fact that the court finds that defendant acted in accordance with law as to this claim, the court believes that discussion of the numerous issues relating to exhaustion of administrative remedies is unnecessary as to the deemed liquidation issue.

**12.** 19 U.S.C. § 1677 (1982) reads in pertinent part as follows:

(6) Net subsidy.—For the purpose of determining the net subsidy, the administering authority *may* subtract from the gross subsidy the amount of—

\* \* \* \* \* \*

(C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the subsidy received.

terizes the treatment of the lag in tax collection *not* as the imposition of a distinct CVD but rather as an adjustment in the allowance for the offset tax. In enacting this provision, Congress stated that "[i]n determining the amount of offsets which are permitted, it is expected that the administrative authority will only offset amounts which are *definitively established by reliable, verified evidence.*" S.Rep. No. 249, 96th Cong., 1st Sess. at 86, *reprinted in* 1979 U.S.Code Cong. Ad.News 381, 472 (emphasis added). Defendant argues that the use of the word "may" in section 1677(6)(C) places within ITA's sole discretion the decision of whether to allow an offset in calculating the net subsidy.[13] The government seems to argue that the manner of the calculation of the offset is, therefore, nonreviewable. The court doubts that that is truly the intent of Congress here. ITA undoubtedly has discretion in deciding whether to allow an offset, but discretion as to its manner of calculation is not unlimited. As stated by the Supreme Court, judicial review is precluded only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945) (legislative history of APA)). This court has recognized that "judicial review of final agency action is not precluded unless there is persuasive reason to believe that this was the intention of Congress." *Maple Leaf Fish Co. v.*

*United States,* 5 C.I.T. 275, 278, 566 F.Supp. 899, 902 (1983) (citing *Overton Park, supra; Data Processing Service v. Camp,* 397 U.S. 150, 156–57, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (judicial review under APA allowed absent "persuasive reason to believe" Congress intended otherwise)).[14] In the area of international trade, agency and executive determinations have generally been found to be nonreviewable, or reviewable only for procedural irregularities, only in areas where there truly is no law to apply such as the "multifaceted judgmental decision to settle a claim," *Montgomery Ward & Co. v. Zenith Radio Corp.,* 69 C.C.P.A. 96, 108, 673 F.2d 1254, 1262 (Fed.Cir.1982) (Secretary of Commerce's settlement agreement in antidumping matter), and in those areas fraught with foreign affairs considerations. *See Florsheim Shoe Co. v. United States,* 744 F.2d 787, 793 (Fed.Cir.1984) (decision regarding duty-free treatment under Generalized System of Preferences is "intimately involved with foreign affairs"); *Sacilor, Acieries Et Laminoirs De Lorraine v. United States,* 9 C.I.T. ——, 613 F.Supp. 364, 369–70 (1985) (allowance of additional imports under "short supply" exception is within realm of foreign affairs), *appeal docketed,* No. 85–2706 (Fed.Cir. Aug. 26, 1985). The decision in question, the manner in which an offset is calculated by ITA, falls within neither of these categories and, in fact, Congress not only specifically pro-

(emphasis added).

**13.** To be consistent with the GATT Subsidies Code, CVDs can be imposed only to the extent "necessary to eliminate the amount of the subsidy." General Agreement on Tariff and Trade: Interpretation and Application of Articles VI, XVI and XXIII, Apr. 12, 1979, part I, article 4, 31 U.S.T. 513, 524, T.I.A.S. No. 9619. Although inconsistent statutory provisions will prevail over GATT, Congress has stated that the Trade Agreements Act of 1979 was intended to be GATT consistent. *See* S.Rep. No. 249 at 1, 1979 U.S.Code Cong. & Ad.News at 387. Arguably, if there is an offset, duties are not necessary to eliminate the subsidy. Based on the arguments presented in this case, the court is not prepared to conclude that ITA is free to totally ignore

offsets clearly evidenced by reliable information. This issue need not be resolved here because it is apparent in this case that, thus far, ITA has taken the offset into account in some manner.

**14.** These limited exceptions to judicial review correspond (in reverse order) to the limitations on judicial review found in § 701(a) of the APA. 5 U.S.C. § 701(a) (1982). According to this provision, judicial review is allowed "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *Id.; see Heckler v. Chaney,* —— U.S. ——, 105 S.Ct. 1649, 1654–55, 84 L.Ed.2d 714 (1985).

vided for judicial review in this area, but also gave guidance as to the type of evidence that would support an offset. The court concludes that there is "law to apply" to the manner in which ITA calculates an offset under this section and, as such, if an offset has been allowed it must be calculated in a way that does not amount to an abuse of whatever discretion is allowed. *See Montgomery Ward*, 69 C.C.P.A. at 107, 673 F.2d at 1261 ("If an action is discretionary but there is law from which a court may determine that the exercise of discretion is arbitrary or capricious, or not in accordance with law, the decision itself may be reviewed on that limited basis.")

■ ITA initially allowed an offset in this case because it believed that an export tax, which nullified the IPI export credit subsidy, had been assessed on June 26, 1981, by the Brazilian government. Prior to issuance of its "final review" in the second section 751 review, however, ITA discovered that the Brazilian government did not begin to collect the offsetting export tax until December 31, 1982. ITA concluded that "the lag in collection was *equivalent to an interest free loan* in the amount of the tax owed rolled over monthly until the tax was actually paid." 49 Fed.Reg. at 9,925 (emphasis added). The "loan" was deemed to have been made on the date on which the tax was due, which, under current practice, was determined to be forty-five days after the end of the month in which the shipment earning premium occurred. ITA calculated the *ad valorem* benefit of this delay to be .95 percent, using the monthly Banco de Brasil rate for discounts of accounts receivable of 4.97 percent. *Id.* Plaintiff asserts that what ITA did here was to impose a CVD based on the lag in tax collection without first establishing that such lag constitutes a countervailable subsidy. At oral argument, defendant claimed, to the contrary, that its reference to the lag in collection as an "interest free loan" was merely by way of analogy and that ITA was, in fact, adjusting the offset allowed under 19 U.S.C. § 1677(6)(C) to reflect the fact that the offset tax imposed was not collected immediately rather than recognizing another form of subsidy. The administrative record provides no guidance as to whether ITA did in fact treat the lag in tax collection as a separate countervailable subsidy or whether ITA simply adjusted the offset allowed under section 1677(6)(C). Inasmuch as this matter is remanded for a related purpose, and inasmuch as plaintiff had no opportunity to comment on this late-arising issue, the court deems it appropriate for ITA to review this aspect of its order as well. It appears to the court that if ITA treats the lag in tax collection as an interest free loan justifying imposition of a CVD, it must first be established that such lag is in fact a countervailable subsidy within the meaning of the statute. *Compare, e.g., Carlisle Tire and Rubber Co. v. United States*, 5 C.I.T. 229, 564 F.Supp. 834 (1983) and *Cabot Corp. v. United States*, 9 C.I.T. ——, 620 F.Supp. 722 (1985) (limits of countervailable subsidies based on general availability). In the alternative, if ITA treats the alleged .95 percent *ad valorem* benefit of the delay between imposition and collection of the offset tax as an adjustment to the CVD offset allowed under section 1677(6)(C), ITA should address the arguments raised by plaintiff concerning its methodology.

## V. *Conclusion*

For the above reasons the court concludes that the second annual review was not conducted in accordance with law. This matter is remanded to ITA for further action consistent with this opinion.