**AMBASSADOR DIVISION OF FLORSHEIM SHOE, Appellee,**

v.

**The UNITED STATES, Appellant,**

**and**

**Footwear Industries of America, Inc., Intervenor.**

**Appeal No. 84–814.**

United States Court of Appeals, Federal Circuit.

Nov. 19, 1984.

A. David Lafer, Washington, D.C., argued for appellant. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen.; David M. Cohen, Director and Francis J. Sailer, Washington, D.C.

Lauren R. Howard, Collier, Shannon, Rill & Scott, Washington, D.C., argued for intervenor, Footwear Industries of America, Inc.; Michael R. Kershow, Collier, Shannon, Rill & Scott, Washington, D.C., of counsel.

Steven P. Sonnenberg, Sonnenberg, Anderson & O'Donnell, Chicago, Ill., argued for appellee.

Donald B. Cameron, Jr., Daniels, Houlihan & Palmeter, P.C., Washington, D.C., was on the brief for Footwear Retailers of America, amicus curiae.

Herbert C. Shelley, Tom M. Schaumber and Alice A. Kipel, Plaia, Schaumberg & Dekieffer, Chartered, Washington, D.C., were on the brief for amicus curiae, The Special Commodity Group on Nonrubber Footwear from Brazil of The American Ass'n of Exporters and Importers.

Before MARKEY, Chief Judge, NICHOLS, Senior Judge, and BALDWIN, KASHIWA and MILLER, Circuit Judges.

NICHOLS, Senior Circuit Judge.

██ The United States prosecutes this appeal to obtain our review of a summary judgment by the Court of International Trade (CIT) according to which the facts ascertained in a "Periodic Review" of a countervailing duty determination cannot be applied to entries in the period the review relates to, because by law the duties applicable to those entries must have been finally determined before the facts could have been known. We *reverse*.

### Statement of the Case

The decision in question is reported at 577 F.Supp. 1016 (1983), and familiarity with it is assumed in what follows. The relevant facts are few and simple, but the statutes and regulations to be applied equal the complexity of the much-abused Internal Revenue Code. We state what is necessary to understand our decision, leaving the reader who wishes to know all the ramifications to the decision below.

Briefly, then, the involved merchandise was leather footwear from India, either complete or uppers, entered or withdrawn from warehouses in the United States in calendar year 1980. There had been on the books for many years a statute, codified in 19 U.S.C. § 1303, providing for "countervailing duties" against products subsidized by the country of export. On October 26, 1979, the Treasury Department, which then administered the Act, issued a "final determination" that India paid such a subsidy and stated the amounts to be countervailed as 4.24 percent ad valorem for leather footwear and 1.01 percent for uppers. "Liquidations" were ordered suspended. TD 79–275, 44 Fed.Reg. 61588 (1979).

Effective January 1, 1980, the Congress in the Trade Agreements Act of 1979 made extensive revisions in the countervailing and antidumping laws. A completely new countervailing law was written, but India remained under the old one, as the new statute provided, because it had not, as of 1980 at least, become one of the "agreement countries" for which the more lenient new law was written. Of great importance for this case, 19 U.S.C. § 1675(a) provides for annual "reviews" of outstanding countervailing duty orders, both under new and old law. Authority to administer these

laws passed to the International Trade Administration (ITA), an entity of the Commerce Department. On May 12, 1980, ITA announced it would review all outstanding, *i.e.*, Treasury, countervailing duty orders. Meanwhile it directed Customs to maintain its suspension of liquidation. On February 17, 1982, ITA published the results of its review of the subject 1980 imports and determined that in that year India paid 15.08 percent ad valorem for footwear and 12.58 percent for lasted leather uppers, as subsidies. It directed Customs to make assessments accordingly, meaning final liquidations. ITA reasoned that by necessary implication the statutory scheme required retroactive assessments, that is, retroactive from the date of fact finding, and suspension of liquidation therefore had been required in the sense of 19 U.S.C. § 1504, which allows suspension "if required by statute," because necessary to carry out this statutory scheme.

This lawsuit followed. We have been aided by able briefs of counsel and of *amici* on both sides of the issue.

The reasoning of the CIT judge was exactly the reverse of the ITA. He scrutinized every possible statute and regulation, nowhere finding authority for suspension in the peculiar circumstances of this case, however it might be in other circumstances. He therefore interpreted the statutory scheme as envisioning that the results of periodic reviews, unlike original determinations, and unlike dumping cases, could have "prospective" application only, the entries in the period under study having been long since liquidated if the law had been complied with. It would apparently follow that the first entries or withdrawals from warehouse to which the 1980 investigation could apply; would be those after February 17, 1982, over a year after the close of the period investigated.

### Discussion

■ The CIT judge probably was writing for a more technically knowledgeable readership than are we, and therefore took for granted some things we deem to require expression here. First, a liquidation is, as Customs Regulation 159.1 defines it—

* * * the final computation or assessment of the duties or drawback accruing on an entry.

All the duties, we stress. None can be liquidated until all of them are. The merchandise entered normally has passed into the commerce of the United States on the deposit of estimated duties, a figure which binds neither side, and is the sum of regular and special duties, as estimated.

A liquidation is "final and conclusive upon all persons (including the United States and any officer thereof)," 19 U.S.C. § 1514(a). By subsection (b) this also applies to other judicially reviewable determinations in countervailing duty cases even if not liquidations. There are, of course, exceptions to finality in case of a timely application for judicial review. In case of a countervailing duty, this occurs under 19 U.S.C. § 1516a. The only other exceptions that come to mind are 19 U.S.C. § 1520, correction of inadvertent error, and § 1521, fraud.

By 19 U.S.C. § 1504(a), except as provided in subsection (b), an entry not liquidated in one year is "deemed" liquidated, *i.e.*, made final, at the rate claimed on entry. Subsection (b) allows the Secretary to extend the time allowed for liquidation by formal notice of extension to the importer if—

(1) information needed for the proper appraisement or classification of the merchandise is not available to the appropriate customs officer;

(2) liquidation is suspended as required by statute or court order * * *.

(3) [Not here relevant.]

This was enacted in 1978, thus only a year before the 1979 Trade Agreements Act, Pub.L. No. 95–410, 92 Stat. 902. The prior law had been that Customs might delay liquidation as long as it pleased, and with or without a formal suspension notice. *Peugot Motors v. United States*, No. 84–103 (slip op. CIT Sept. 13, 1984, Ford. *J.*). *See* S.Rep. No. 778, 95th Cong., 2d Sess. 1, 31, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2211, 2242 (Finance Committee Report). The Committee stated the reason

for now requiring prompt liquidation was the uncertainty importers were being kept in, often for years, as to whether they might face further exactions, or when the refunds to which they might be entitled would be paid. It noted that several countries participating in the multilateral trade negotiations had requested a change in this.

In our view, § 1504 is the key to the puzzle we have to answer. If the ITA was right in thinking it could find an implied statutory requirement, absent an express one, where the statute could not be implemented without suspension, then the CIT judge was in error.

If the ITA's reasoning is not compelling, it is plausible, and its own almost contemporaneous interpretation of § 1504 is an important consideration. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Smith-Corona Group v. United States*, 713 F.2d 1568 (Fed.Cir.1983). It does not seem so very unreasonable or farfetched to say that the law "requires" you to do something, if it is something you have to do to obey the law.

On the other hand, the interpretation favored by the CIT judge and the appellee may be right as matters of cold textual analysis, but produces absurd results, results that were not and could not have been within the contemplation of Congress. It is absurd to say that the ITA must investigate annually the subsidies in effect in India or anywhere else, yet to say it cannot act on its factual findings with respect to the very year to which they apply. Why then the concern for *annual* review? Since by § 1504 the entry, unless suspended, must be liquidated within one year, or if not, is "deemed" liquidated, *i.e.*, is final, the government has no means of adding to the liquidated amount whatever the facts, absent an inadvertent error. The importer would have been in a like plight if, as is surely not unimaginable, the effect of the original determination had been to cause the offending nation to stop its unfair trade practice. The importer then must go on for over a year paying a countervailing duty that countervails an unfair practice · that was not in effect in that year. It might be suggested the importer could avoid this result by appealing to the CIT. This suggestion would assume the CIT had not made it *legally irrelevant* what subsidies were actually in effect at the time of importation. Surely the Congress could not have intended to prohibit the ITA from giving, and require the CIT to give, effect to the same set of established facts.

If the Customs officers need more information for the proper appraisement or classification of merchandise, they may suspend. Information as to subsidies is not either appraisement or classification, exactly, but if information is equally necessary, it is an anomaly if the right to suspend to obtain it is denied. Liability to countervailing duties could well be considered an item of "classification."

The interpretation question here is not whether Congress or a regulation expressly authorized the suspension, as the CIT mistakenly supposed. It is whether Congress expressly prohibited the suspension in § 1504. We must read that statute against the background fact that always previously the Customs had liquidated only when it was ready, and postponed liquidation indefinitely by unannounced delay, or by suspension which was only delay announced and regularized. No doubt it would do so today with perfect legality but for the bars of § 1504. Did, therefore, Congress in § 1504 expressly prohibit the suspension here involved? If it did not, we must reverse.

We may concede arguendo that as a matter of cold parsing of statutory language the CIT has somewhat the better of the argument, though the reading by the ITA is plausible, far better than merely frivolous. What tips the scale towards reversal, besides the respect due the interpretation of the administering agency, is application of the technique of testing an interpretation of a statute by the absurdity of its consequences, joined with the lack of support in legislative history for the result proposed.

A classic case, still often cited, is *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), in which the Treasury sought to enforce a penalty prescribed by an act to prohibit the importation of aliens under contract to perform (coolie) labor, as the over-broad statutory language seemed to require, against a church which selected a Canadian as its pastor. The Court said at 459:

It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. * * * This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in quotation, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislature intended to include the particular act.

How that case has fared as a precedent would require a study which, if exhaustive, would produce here a discourse of excessive length. However, three recent instances will illustrate our points. In *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the celebrated "snail darter" case, Justice Powell at 204 relied heavily on *Holy Trinity Church* in his dissent, but the Chief Justice, for the Court, wrote at 187 n. 33, 98 S.Ct. at 2298 n. 33—

This Court, however, later explained *Holy Trinity* as applying only in "rare and exceptional circumstances * * *. And there must be something to make plain the intent of Congress that the letter of the statute is not to prevail," citing *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930).

However, about a year later, in *United Steelworkers v. Weber*, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979), Justice Brennan, for the Court, cited and relied on *Holy Trinity Church* again. In that case the issue was whether Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., when it said employers could not "discriminate * * * because of * * * races" prohibited a plan privately agreed upon between an employer and a union, which created preferences for black job applicants because of a then-existing "racial imbalance." He quoted part of the passage from *Holy Trinity Church*, quoted further above. It appears, therefore, that the *Holy Trinity Church* doctrine is alive and well, whatever differences there may be about individual applications. Justice Brennan's point was, if the troublesome passage were given literal application, it would frustrate other parts of Title VII, which he quoted, and its purpose as shown by its legislative history would be defeated.

Still later in *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), the Court upheld the literal application of a statutory penalty for delayed payment of seamen's wages, in an amount many minds would consider absurd. The Court was satisfied the Congress was aware of and intended that the penalty would often be out of all proportion to the pecuniary injury to the seaman, who would thus receive a windfall comparable in a small way to the treble damages in an antitrust case. Justice Stevens, dissenting, relied heavily on *Holy Trinity Church*.

It would seem the narrowing of *Holy Trinity* as an authoritative precedent is only as applied to possible cases such as *Griffin*, where the result looks preposterous but a true intent narrower than the literal words cannot clearly be shown.

■ We think these views about *Holy Trinity Church* and its absurd-consequences doctrine of interpretation are not in conflict if applied to a case, as here, where the supposed absurdity does not arise from the judge thinking himself wiser than the legislator, or better able to draft workable laws, where the true intent of Congress is clearly articulable from the whole body of laws of which the provision to be construed is a part, or the legislative history, and where the literally stated in-

tent is broader than the true intent. Overbreadth is an error almost impossible for the legislative draftsman to avoid. He knows what he wants to accomplish, but not how his words will be taken "out there" in situations he does not envisage.

 As shown by the legislative report already cited, the true intent of § 1504, besides relieving importers of prolonged uncertainty, was to bring the United States into conformity with international expectations interpreted to require that duty liabilities should be ascertained and fixed generally within a year after entry. There is no particular reason to think that the protection of imports from "nonagreement" countries against duties to countervail unfair subsidies was within that intent. On the other hand, the intent imputed by the CIT would be nothing less than a monkey wrench thrown into the carefully constructed statutory countervailing duty machinery and would do nothing to enhance the reputation of the United States as a nation which honors standards of fair dealing in its regulation of international trade. For example, by § 1675(a)(1) the ITA is after each year's review to publish "any duty to be assessed, [and] estimated duty to be deposited * * *." The estimated duty to be deposited is plainly the estimated duties from the date of publication forward. Therefore, the duty to be assessed can only be the duty incurred in the past period covered by the review, and Congress must therefore have had in mind that final liquidation would not have occurred.

We note that both § 1504 and the provisions respecting countervailing duties, such as § 1675(a), were enacted as in *pari materia*, both being for amendment to the basic Tariff law, the Tariff Act of 1930, and therefore a legislative intent to have them work harmoniously together, and for neither to frustrate the other, or partially repeal it, is very much to be inferred.

It is true the Senate Finance Committee issued a press release, No. 116, as noted by the CIT, which stated that duties would be assessed after review prospectively only. This release has no counterpart in the legislative history and is not itself a part there-

of. Errors occur in descriptions of legislation, even in formal committee reports, and such errors must be more frequent in press releases, prepared by who knows whom? It is also true that as to an "agreement country" estimated duties as deposited prior to publication of the review findings could only be reduced, not increased, according to § 1671f(a), but India was not an "agreement country." We stress again that we consider only the procedure respecting a nonagreement country under 19 U.S.C. § 1303. Arguments have been widereaching, but we do not mean our conclusions to be so likewise.

Other matters put forth by the parties and *amici* have been considered, but do not affect the conclusion we reach.

REVERSED.