291 F.3d 806
 FAG ITALIA S.p.A. and Fag Bearings Corporation, Plaintiffs-Appellants, and
SKF USA Inc. and SKF Industries S.p.A., Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Cross Appellant, and
The Torrington Company, Defendant-Cross Appellant.
 No. 01-1212.
 No. 01-1215.
 No. 01-1213.
 No. 01-1214.
 United States Court of Appeals, Federal Circuit.
 May 24, 2002.
 
 COPYRIGHT MATERIAL OMITTED Max F. Schutzman, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, argued for plaintiff-appellant FAG Bearings Corporation and FAG Italia S.p.A. With him on the brief were Andrew B. Schroth, Mark E. Pardo, and Adam M. Dambrov. Of counsel was Jeffrey S. Grimson.
 Herbert C. Shelley, Steptoe & Johnson LLP, of Washington, DC, argued for plaintiff-appellant SKF USA Inc. and SKF Industrie S.p.A. With him on the brief was Alice A. Kipel.
 Reginald T. Blades, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant United States. On the brief were Stuart E. Schiffer, Acting Assistant Attorney General: David M. Cohen, Director; Velta A. Melnbrencis, Assistant Director. Of counsel on the brief were David R. Mason and John F. Koeppen, Attorneys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.
 Geert De Prest, Stewart and Stewart, of Washington, DC, argued for defendant-cross appellant the Torrington Company. With him on the brief were Terence P. Stewart and Lane S. Hurewitz.
 Before MICHEL, DYK, and PROST, Circuit Judges.
 Opinion for the court filed by Circuit Judge DYK, in which Circuit Judge PROST joins. Circuit Judge MICHEL concurs-in-part and dissents-in-part.
 DYK, Circuit Judge.
 
 
 1
 This case presents two issues. First, it involves the question whether the Department of Commerce ("Commerce") properly defined "foreign like product" for purposes of 19 U.S.C. §§ 1677b(a)(1) and 1677b(e). In SKF USA Inc. v. United States, 263 F.3d 1369 (Fed.Cir.2001), we vacated the Court of International Trade's decision on that identical issue and remanded for Commerce to explain why it uses a different definition of "foreign like product" for price-based calculations for normal value than it does for calculations of constructed value. The parties agree that SKF USA governs here, and that we should likewise remand this case to Commerce for further consideration of that issue. Accordingly, we will not discuss the "foreign like product" issue further in this opinion. We vacate the decision of the Court of International Trade on this issue and remand for further proceedings consistent with our opinion in SKF USA.
 
 
 2
 Second, this case involves the question whether Commerce can properly conduct a duty absorption inquiry pursuant to 19 U.S.C. § 1675(a)(4) for "transition orders"[1] in 1996 and 1998, the second and fourth years after the deemed issuance date of transition orders under section 1675(c)(6)(D). We hold that Commerce's action in conducting such inquiries is not authorized by the statute and affirm the judgment of the Court of International Trade in this respect. The opinion that follows addresses that issue.[2]
 
 Statutory Background
 
 3
 The antidumping statute is designed to prevent foreign goods from being sold at unfairly low prices in the United States to the injury of United States producers. Antidumping orders are issued as a result of a process that involves both Commerce and the ITC.
 
 
 4
 Commerce decides whether dumping exists by determining whether foreign merchandise has been sold or is likely to be sold in the United States at "less than its fair value." 19 U.S.C. § 1673(1) (2000). Commerce first makes a preliminary determination whether there is a reasonable indication that foreign merchandise is being sold at less than fair value, 19 U.S.C. § 1673b(b)(1)(A) (2000), then establishes dumping margin[3] rates reflecting that amount. 19 U.S.C. §§ 1673d(a)(1), 1673d(c)(1)(B) (2000). The ITC determines whether a domestic industry is "materially injured" or is "threatened with material injury," or whether "the establishment of an industry in the United States is materially retarded" by dumping. 19 U.S.C. § 1673d(b)(1) (2000). If the determinations of Commerce and ITC are both affirmative, Commerce issues an antidumping order assessing duties on the foreign exporter. 19 U.S.C. § 1673d(c)(2) (2000).
 
 
 5
 Before the amendments to the antidumping statute under the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103-465, 108 Stat. 4809 (1994), the only statutorily authorized review of antidumping orders after they were issued was Commerce's annual administrative review, in which Commerce reviewed the amount of antidumping duty, and recalculated the dumping margin as necessary to reflect actual competitive conditions. 19 U.S.C. § 1675(a)(1) (1988). These annual reviews were continued in the URAA amendments. See 19 U.S.C. § 1675(a)(1) (2000). Under the URAA amendments, Congress additionally: (1) authorized Commerce to conduct so-called duty absorption inquiries in conjunction with its second and fourth annual administrative reviews of antidumping orders, upon request by an interested domestic party; and (2) provided for a completely new kind of review of antidumping duty orders: sunset reviews, to be jointly conducted by ITC and Commerce five years after the issuance of an order. Sunset reviews eliminate needless antidumping orders by terminating orders after five years, unless ITC and Commerce both determine that revocation of the orders would lead to recurrence of dumping and material injury. Subsection (a) of section 1675 governs duty absorption inquiries. Subsection (c) governs sunset reviews.
 
 Duty Absorption
 
 6
 The purpose of a duty absorption inquiry is to ensure that foreign exporters identified by Commerce as dumping goods in the United States do not undermine the purpose of the antidumping laws by "absorbing" the duty rather than passing the duty on to United States purchasers in the form of higher prices. In such circumstances, dumping continues despite the assessment of the duty, and, as a result, "the remedial effect of an antidumping order may be undermined...." Joint Report of the Committee on Finance, Committee on Agriculture, Nutrition, and Forestry, Committee on Governmental Affairs of the United States Senate to accompany S. 2467, S.Rep. No. 103-412, at 44 (1994).
 
 Congress provided that:
 
 7
 During any [annual] review ... initiated 2 years or 4 years after the publication of an antidumping duty order, [Commerce], if requested, shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter.
 
 
 8
 19 U.S.C. § 1675(a)(4) (2000).[4] Section 1675(a)(4) further provides that Commerce "shall notify the [ITC] of its findings regarding such duty absorption for the [ITC] to consider in conducting a [sunset review]."
 
 
 9
 The consequence of a finding of duty absorption by Commerce is that the anti-dumping order is less likely to be revoked as a result of a sunset review. The Statement of Administrative Action recognized that "[d]uty absorption may indicate that the [foreign] producer or exporter would be able to market more aggressively should the order be revoked as a result of a sunset review." Uruguay Round Agreements Act: Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, at 886 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4211. It was further understood:
 
 
 10
 Duty absorption is a strong indicator that the current dumping margins calculated by Commerce in reviews may not be indicative of the margins that would exist in the absence of an order. Once an order is revoked, the importer could achieve the same pre-revocation return on its sales by lowering its prices in the U.S. in the amount of the duty that previously was being absorbed....
 
 
 11
 An affirmative finding of absorption in an administrative review initiated two years after the issuance of an order is intended to have a deterrent effect on continued absorption of duties by affiliated importers; if they engage in duty absorption, they will know that they will face an additional hurdle that will make it more difficult to obtain revocation or termination. If, in the four-year review, Commerce finds that absorption has taken place, it will take that into account in its determination regarding the dumping margins likely to prevail if an order were revoked.
 
 
 12
 Id. at 885-86, reprinted in 1994 U.S.C.C.A.N. at 4210 (emphases added).
 
 Sunset Reviews
 
 13
 The purpose of the sunset review is to eliminate needless orders by terminating antidumping orders after five years unless Commerce determines that revocation of the duty "would be likely to lead to continuation or recurrence of dumping," and ITC determines that revocation of the duty "would be likely to lead to ... material injury." 19 U.S.C. § 1675(c)(1) (2000). Unless both agencies make affirmative determinations, the order must be revoked. The sunset review is held "5 years after the date of publication of ... an antidumping duty order," and every five years thereafter. 19 U.S.C. § 1675(c)(1)(A) (2000); S.Rep. No. 103-412, at 45.
 
 
 14
 ITC considers several factors in deciding whether revocation would likely lead to material injury. 19 U.S.C. § 1675a(a)(1) (2000).[5] Among other things, the statute provides that in sunset reviews ITC "shall" consider Commerce's two and four-year duty absorption determinations. 19 U.S.C. § 1675a(a)(1)(D) (2000).
 
 Transition Orders
 
 15
 There is no issue in this case as to the operation of these duty absorption inquiry or sunset review provisions with respect to antidumping orders issued after January 1, 1995, the date the URAA amendments came into effect in the United States. The controversy concerns orders issued before that date — so called "transition orders." A "transition order" is defined in the statute as "an antidumping duty order ... which is in effect on the date the WTO Agreement enters into force with respect to the United States," that is, January 1, 1995. 19 U.S.C. § 1675(c)(6)(C) (2000). Congress was well aware that "there likely will be more than 400 of these transition orders" issued before January 1, 1995, and Congress also recognized that "special rules are necessary to enable the agencies to conduct five-year reviews within a reasonable period and in a manner consistent with the [URAA] Agreements." SAA at 882, reprinted in 1994 U.S.C.C.A.N. at 4208. Congress accordingly explicitly provided for sunset review of transition orders: "[f]or purposes of this subsection [(c)], a transition order shall be treated as issued on the date the WTO Agreement enters into force with respect to the United States." 19 U.S.C. § 1675(c)(6)(D) (2000). Thus, transition orders were deemed issued on January 1, 1995, and subject to a sunset review five years after that date.
 
 
 16
 In the URAA amendments, Congress did not provide for duty absorption inquiries of transition orders in the second or fourth years after the deemed issuance date. Nonetheless, Commerce has claimed the authority to undertake such duty absorption inquiries for transition orders in the second and fourth years after the deemed issuance date, thus leading to the present proceeding.
 
 Proceedings Below
 
 17
 In 1997, Commerce promulgated a regulation interpreting the statutory scheme as permitting it to conduct duty absorption inquiries of transition orders, if requested, in any annual review initiated in 1996 or 1998. 19 C.F.R. § 351.213(j) (1998).[6] However, this regulation is not binding here, because the review at issue was initiated in 1996, and the regulation applies only to "administrative reviews initiated on the basis of requests made on or after the first day of July, 1997...." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,416-17 (May 19, 1997). Thus Commerce contradicts itself — on the one hand promulgating a regulation purporting to authorize reviews in 1996, and at the same time stating that that regulation is inapplicable to pre-July 1, 1997, reviews. The regulation nonetheless states Commerce's views that second and fourth year reviews of transition orders are authorized by the statute.
 
 
 18
 This case predates the issuance of that regulation. At issue in this case is the seventh annual administrative review of an antidumping order on antifriction bearings ("AFBs") imported to the United States during the period of May 1, 1995, through April 30, 1996. Plaintiff-appellant FAG-Italia S.p.A. is a manufacturer of AFBs from Italy that are subject to the antidumping order, and plaintiff-appellant FAG Bearings Corporation imports those AFBs (collectively, "FAG"). Plaintiff-appellant SKF USA and plaintiff-appellant SKF Industrie S.p.A. (collectively, "SKF") also manufacture and import Italian AFBs that are subject to the antidumping order.
 
 
 19
 On May 15, 1989, Commerce issued the antidumping order.[7] On June 20, 1996, Commerce initiated the seventh annual administrative review of this order for the period of May 1, 1995, to April 30, 1996.[8] On June 10, 1997, Commerce published Preliminary Results of its review.[9] On October 17, 1997, Commerce published its Final Results.[10] In its Final Results, Commerce found that FAG and SKF engaged in duty absorption with respect to Italian AFBs. 62 Fed.Reg. at 54,044.
 
 
 20
 It is undisputed that the underlying order, originally issued May 15, 1989, is a "transition order" with a deemed issuance date of January 1, 1995, for sunset review purposes. 19 U.S.C. § 1675(c)(6)(D) (2000). From the outset of its investigation, Commerce regarded this seventh annual administrative review as the "second year" review for purposes of its duty absorption inquiry, i.e., as a review taking place during the second year after the January 1, 1995, deemed issue date. On May 31, 1996, and July 9, 1996, the Torrington Co. ("Torrington") requested Commerce to determine, with respect to various respondents, whether antidumping duties had been absorbed during the period of review. Final Results, 62 Fed.Reg. at 54,075. Commerce proceeded to conduct the duty absorption inquiry, explaining the basis for the inquiry in its Preliminary Results:
 
 
 21
 The preamble to [Commerce's] proposed antidumping regulations explains that reviews initiated in 1996 will be considered initiated in the second year and reviews initiated in 1998 will be considered initiated in the fourth year. Although these proposed antidumping regulations are not yet binding upon [Commerce], they do constitute a public statement of how [Commerce] expects to proceed in construing [19 U.S.C. § 1675(a)(4)]. This approach ensures that interested parties will have the opportunity to request a duty-absorption determination prior to the time for sunset review of the order under [19 U.S.C. § 1675(c)] on entries for which the second and fourth years following an order have already passed.
 
 
 22
 Preliminary Results, 62 Fed.Reg. at 31,568 (citation omitted). Commerce concluded:
 
 
 23
 Because these orders on AFBs have been in effect since 1989, these are transition orders in accordance with [19 U.S.C. § 1675(c)(6)(C)]; therefore, based on the policy stated above, [Commerce] will consider a request for an absorption determination during a review initiated in 1996. This being a review initiated in 1996 and a request having been made, we are making a duty-absorption determination as part of these administrative reviews.
 
 
 24
 
 Id.
 
 
 
 25
 In its Final Results, Commerce repeated its rationale for conducting the duty absorption inquiry. 62 Fed.Reg. at 54,074-75. It also found that SKF and FAG failed to put evidence into the record to support their position that they and their affiliated importers were not absorbing the duties, and concluded that duty absorption had occurred. 62 Fed.Reg. at 54,076. SKF and FAG challenged the Final Results as they pertain to AFBs from Italy in the United States Court of International Trade.
 
 
 26
 In FAG Italia S.p.A. v. United States, No. 97-11-01984, 2000 WL 978462 (Ct. Int'l Trade July 13, 2000), the Court of International Trade concluded that Commerce lacked statutory authority to conduct a duty absorption inquiry for the transition order in dispute. The court relied on its reasoning in SKF USA Inc. v. United States, 94 F.Supp.2d 1351 (Ct. Int'l Trade 2000), after determining that the duty absorption inquiry and the parties' arguments in this case were "practically identical" to those in SKF USA. FAG Italia at *5. In the earlier case, the court determined that Commerce lacked authority to conduct a duty absorption inquiry in the ninth administrative review of a transition order, finding that "the deemed January 1, 1995 issuance date of § 1675(c)(6)(D) is inapplicable to the order." SKF USA, 94 F.Supp.2d at 1357. The court found that section 291 of the URAA provided an "`unambiguous directive' from Congress" that the section providing for duty absorption inquiries "must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews," and accordingly concluded that Commerce lacked authority to conduct the duty absorption inquiry of the transition order at issue. Id. at 1358-59 (internal citations omitted). Relying on SKF USA, the court in Fag Italia remanded to Commerce with instructions to "annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for this review." Fag Italia at *8. Upon finding that Commerce complied with the terms of the remand, the court issued its final judgment in Fag Italia S.p.A. v. United States, No. 97-11-01984, 2000 WL 1846112 (Ct. Int'l Trade Dec. 15, 2000), dismissing the case.
 
 
 27
 Commerce and Torrington appealed the Court of International Trade's determination that Commerce lacked statutory authority to conduct the duty absorption inquiry. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 STANDARD OF REVIEW
 
 28
 "`When reviewing anti-dumping determinations made by Commerce, this court applies anew the standard of review applied by the Court of International Trade in its review of the administrative record.'" SKF USA Inc. v. United States, 263 F.3d 1369, 1378 (Fed.Cir.2001) (quoting F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1031 (Fed.Cir.2000)).
 
 
 29
 We review questions of statutory interpretation without deference, U.S. Steel Group v. United States, 225 F.3d 1284, 1286 (Fed.Cir.2000), except to the extent that deference to Commerce's interpretation may be required by Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 DISCUSSION
 
 30
 Commerce does not claim that any provision of the statute explicitly authorizes it to conduct duty absorption inquiries as part of its annual review of transition orders in the second and fourth years after January 1, 1995. Nor does Commerce claim that there is any ambiguous language of the statute that might be interpreted to convey such authority.[11] Commerce's concession is well taken. The statute only provides for duty absorption inquiries "[d]uring any review under this subsection [subsection (a), governing annual administrative reviews] initiated 2 years or 4 years after the publication of an antidumping duty order...." 19 U.S.C. § 1675(a)(4)(2000). The order in question was published in 1989; the two and four year annual reviews occurred in 1991 and 1993, well before the absorption provision of the URAA was even enacted. The deemed issuance date for transition orders does not change this result. In providing for a deemed issuance date for transition orders, the statute provides that "[f]or purposes of this subsection [subsection (c), governing sunset reviews], a transition order shall be treated as issued" on January 1, 1995. 19 U.S.C. § 1675(c)(6)(D) (2000). There is no provision creating a "treated as" date for transition orders for purposes of subsection (a), the subsection governing duty absorption inquiries. Finally, the statutory provisions governing annual reviews for Commerce do not confer general authority that might include the power to consider duty absorption. 19 U.S.C. §§ 1675(a)(1)(B), 1675(b)(2) (2000).[12]
 
 
 31
 Commerce nonetheless urges that it has authority to conduct two and four year reviews of transition orders because both the statute and its legislative history are silent as to whether Commerce can conduct duty absorption inquiries in years other than years 2 and 4, and the statute does not explicitly prohibit or deny it such authority.[13]
 
 
 32
 Commerce seriously misunderstands its role under Chevron.[14] The first question we ask under Chevron is whether Congress has spoken to the precise question at issue. Chevron, 467 U.S. at 842, 104 S.Ct. 2778. In the absence of clear direction from the statute, we then ask whether there is ambiguous statutory language that might authorize the agency to fill a statutory gap: "`The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" Id. at 843, 104 S.Ct. 2778 (quoting Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). Then we ask whether Commerce's interpretation of ambiguous statutory language is based on a permissible interpretation of the statute. Id. at 843 & n. 11, 104 S.Ct. 2778. But here, Commerce can identify no ambiguities in the statute, nor any statutory "gaps" that Commerce is entitled to fill. Rather, Commerce argues:
 
 
 33
 Section 1675(a)(4) ... only addresses the question of when Commerce must conduct a duty absorption inquiry, i.e., under certain enumerated conditions. Thus, left unanswered by section 1675(a)(4) is the proper issue that the case presented — whether the statutory scheme as a whole precludes Commerce from conducting a duty absorption inquiry for a transition order. The answer to this question must be in the negative because Congress has stated neither in 19 U.S.C. § 1675(a)(4) nor in any other statutory provision that Commerce is precluded from conducting such an inquiry.
 
 
 34
 Commerce Br. at 46. Given the statutory scheme as a whole and Congress's recognition that Commerce's duty absorption information is useful in ITC's sunset reviews, Commerce argues, Commerce's exercise of its discretion to conduct such reviews serves the purpose of the statute.
 
 
 35
 Thus, Commerce claims that it enjoys plenary power to engage in any activity related to its field of authority not specifically prohibited by Congress, so long as the administrative action will serve a congressional purpose. But no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority. To the contrary, the Supreme Court has noted that "an agency literally has no power to act ... unless and until Congress confers power upon it," La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), and has cautioned that "`[t]o supply omissions [within a statute] transcends the judicial function.'" W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 101, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (quoting Iselin v. United States, 270 U.S. 245, 250-51, 46 S.Ct. 248, 70 L.Ed. 566 (1926)).
 
 
 36
 It is indeed well established that the absence of a statutory prohibition cannot be the source of agency authority. In Southern California Edison Co. v. Federal Energy Regulatory Commission, 195 F.3d 17 (D.C.Cir.1999), the District of Columbia Circuit reiterated that the absence of an express statutory provision cannot be interpreted as giving an agency authority:
 
 
 37
 [T]he court has repeatedly rejected the notion that the absence of an express proscription allows an agency to ignore a proscription implied by the limiting language of a statute, reasoning that such an approach requires "tortured statutory interpretation" and is based on the unlikely circumstance as to congressional intent giving agencies "virtually limitless hegemony, a result plainly out of keeping with Chevron."
 
 
 38
 Id. at 24 (citations omitted). At issue in Southern California Edison were provisions of the Public Utilities Regulatory Policies Act of 1978, 16 U.S.C. §§ 796(17)-(18), 824a-3, 824i, 824k (1994), governing statutory entitlements benefiting certain energy producers. The statute expressly defined a "small power production facility" as one that "produces electric energy solely by the use, as a primary energy source, of biomass, waste, renewable resources, geothermal resources, or any combination thereof." 16 U.S.C. § 796(17)(A)(i) (1994). The Federal Energy Regulatory Commission ("FERC") allowed a producer that burned a substantial amount of natural gas to retain its status as a "small power production facility." FERC argued that the provision defining "primary energy source" refers "only to those uses that FERC may not consider in determining a facility's primary energy source, but has no bearing upon permissible uses of secondary energy sources." Id. at 23 (second and third emphases omitted). The court noted that to adopt FERC's rationale "is to assume a new category of nonconforming uses fueled by such a source that is nowhere mentioned in [the Act] or FERC's regulations and is unnecessary to give meaning to the provisions Congress enacted." Id. at 24. The court rejected FERC's interpretation because it "would have the effect of requiring Congress to state expressly" any denial of authority to the agency. Id.
 
 
 39
 Similarly, in University of the District of Columbia Faculty Ass'n v. District of Columbia Financial Responsibility & Management Assistance Authority, 163 F.3d 616, 621 (D.C.Cir.1998), the District of Columbia Circuit noted that "[a]ppellants' premise that the [agency] has the authority to do anything that is not expressly prohibited by [the governing statute] is quite extraordinary and we reject it." At issue in that case was the District of Columbia Financial Responsibility and Management Assistance Act of 1995, which expressly gave the agency authority to review and approve new collective bargaining agreements ("CBAs"), but was silent as to whether the agency had authority to modify existing CBAs. Id. The agency argued that it was an "enormous stretch" to infer that, when Congress gave the agency authority to review and approve new CBAs, it simultaneously meant to prohibit the agency from modifying existing CBAs, and that it was improper for the district court to assume that, because Congress was silent as to existing CBAs, it meant to exclude such agreements from the agency's authority. Id. The court rejected this argument, relying on the "fundamental principle of statutory interpretation" articulated in Railway Labor Executives' Ass'n v. National Mediation Board, 29 F.3d 655 (D.C.Cir.1994) (en banc), amended by, 38 F.3d 1224 (D.C.Cir.1994), cert. denied, 514 U.S. 1032, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995):
 
 
 40
 The [National Mediation Board] does not even claim that the terms of [the Act] support the authority it asserts.... Instead, the Board would have us presume a delegation of power from Congress absent an express withholding of such power. This comes close to saying that the [National Mediation Board] has the power to do whatever it pleases merely by virtue of its existence, a suggestion that we view to be incredible.
 
 
 41
 Univ. of Dist. of Columbia Faculty Ass'n, 163 F.3d at 621 (quoting Railway Labor, 29 F.3d at 659).
 
 
 42
 In this case, the statutory silence as to Commerce's power to initiate duty absorption inquiries for transition orders does not give Commerce authority to conduct such inquiries. The fact that Commerce is empowered to take action in certain limited situations does not mean that Commerce enjoys such power in other instances. We cannot speculate that conducting two and four year reviews would serve Congress's purpose where Congress did not authorize such reviews for transition orders.[15] Nor is there any legislative history suggesting that Congress contemplated such two or four year reviews for transition orders.[16]
 
 
 43
 To be sure, if provisions of the statute were rendered meaningless if the authority Commerce seeks were denied to it, we would have a very different case. In SKF USA Inc. v. United States, 263 F.3d 1369, 1379-80 (Fed.Cir.2001), we resolved an apparent anomaly in the antidumping statute where the definition of a key statutory term appeared to apply solely to one part of the statute, in which the term did not even appear. Absent our interpretation applying that definition to the part of the statute in which the term actually appeared, the definition was meaningless.
 
 
 44
 But that is not the situation here. Our interpretation does not render any portion of the statute superfluous. Section 1675(c)(6)(D) fixes the issuance date for transition orders at January 1, 1995. Sections 1675(c)(6)(A)(i) and 1675(c)(6)(A)(ii) provide a schedule under which sunset reviews of transition orders are to be initiated and concluded: "[Commerce] shall begin its [sunset] review of transition orders in the 42d calendar month after the date such orders are issued," that is, January 1, 1995, and "reviews of all transition orders shall be completed not later than 18 months after the 5th anniversary of the date such orders are issued." The "date such orders are issued" refers to the date fixed in section 1675(c)(6)(D), i.e., "the date the WTO Agreement enters into force with respect to the United States." Thus, the purpose of section 1675(c)(6)(D) is to subject transition orders to sunset reviews, by setting the date referred to in section 1675(c)(6)(A)(i).[17] Our interpretation gives meaning to all sections of the statute, including subsection (D).
 
 
 45
 While the sunset review provision states that the ITC "shall take into account," among other things, "the findings of [Commerce] regarding duty absorption under section 1675(a)(4)," 19 U.S.C. § 1675(a)(1) (2000), and such considerations cannot occur when no findings have been made by Commerce as to transition orders, we think that this minor anomaly is insufficient to confer authority on Commerce to conduct such reviews. Section 1675a(a)(1) must refer only to the situation in which duty absorption inquiries in fact exist. Even under Commerce's interpretation of the statute, duty absorption determinations may or may not exist for a particular sunset review (since such determinations, even under Commerce's view, are made only upon request). Commerce itself provides a rationale as to why Congress might have failed to provide authority for duty absorption inquiries as to transition orders: "Given this large number of transition orders that were subject to five-year reviews, it may well be that Congress simply did not wish to overburden Commerce by requiring it to conduct duty absorption inquiries for the transition orders." Commerce Br. at 52-53.
 
 
 46
 In effect, Commerce's interpretation requires the addition of statutory language that Congress did not include. Commerce would have us rewrite section 1675(c)(6)(D) to read "[f]or purposes of this subsection, and subsection (a), a transition order shall be treated as issued on" January 1, 1995. This we cannot do.[18]
 
 
 47
 In holding that Commerce lacks authority to conduct two and four-year duty absorption inquiries for transition orders, we do not reach the question whether Commerce might have been authorized to conduct duty absorption inquiries as part of the sunset review itself under Commerce's general mandate to "conduct a review to determine ... whether revocation of the... antidumping duty order ... would be likely to lead to continuation or recurrence of dumping." 19 U.S.C. § 1675(c)(1) (2000); see also 19 U.S.C. §§ 1675(d)(2), 1675a(c)(1) (2000). It might be argued that the general authority to conduct a sunset inquiry into the likelihood of continuation or recurrence of dumping (including with respect to transition orders) authorizes Commerce to consider absorption, even though section 1675(a)(4) deals explicitly with that subject. Recently in National Cable & Telecommunications Ass'n, Inc. v. Gulf Power Co., 534 U.S. 327, 122 S.Ct. 782, 789-90, 151 L.Ed.2d 794 (2002), the Supreme Court considered the FCC's authority to regulate pole attachment rates for wireless carriers. Sections 224(a)(1) and 224(d)(2) of the Pole Attachments Act specifically authorized the regulation of pole attachment rates but did not cover wireless carriers. The Court nonetheless interpreted sections 224(b) and 224(a)(4) of the Act, generally granting the FCC authority to "regulate the rates, terms, and conditions for pole attachments," id. at 789, as authorizing the FCC to regulate rates for "pole attachments" of wireless carriers, noting that "nothing in § 224(a)(1) or § 224(d)(2) limits § 224(a)(4) or § 224(b)." Id. at 790. Thus, despite the fact that the FCC lacked authority to regulate such carriers under certain specific sections of the statute, the Supreme Court found authority in more general provisions of the statute. But Commerce does not here argue that section 1675(c)(1) is a source of authority to conduct duty absorption inquiries for transition orders, and did not purport to exercise any such authority here. We decline to determine if such authority existed.
 
 
 48
 We affirm the Court of International Trade's determination that Commerce lacked authority to conduct a duty absorption inquiry with respect to this transition order, and we vacate and remand to the Court of International Trade for a determination of the "foreign like product" issue, consistent with our opinion in SKF USA.
 
 
 AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.
 
 COSTS
 
 49
 No costs.
 
 
 
 Notes:
 
 
 [1]
 "Transition orders" are orders predating January 1, 1995, "the date the WTO Agreement enter[ed] into force with respect to the United States." 19 U.S.C. § 1675(c)(6)(C) (2000)
 
 
 [2]
 Contrary to FAG's argument, this case is not moot. The International Trade Commission's ("ITC's") sunset review proceeding is not yet final, and a remand here would require the ITC to consider Commerce's duty absorption determinations
 
 
 [3]
 The "dumping margin" is the total amount by which the price charged for the subject merchandise in the home market exceeds the price charged in the United States. 19 U.S.C. § 1677(35)(A) (2000)
 
 
 [4]
 The duty absorption inquiry only applies to affiliated importers. 19 U.S.C. § 1675(a)(4) (2000). The regulations deal separately with the problem of unaffiliated importers who are reimbursed by foreign exporters, providing that Commerce, when calculating the export price, will "deduct the amount of any antidumping duty or countervailing duty which the exporter or producer: (A) Paid directly on behalf of the importer; or (B) Reimbursed to the importer." 19 C.F.R. § 351.402(f) (2001). This has the effect of increasing the duty amount
 
 
 [5]
 Section 1675a(a)(1) provides in part:
 The [ITC] shall take into account —
 (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued or the suspension agreement was accepted,
 (B) whether any improvement in the state of the industry is related to the order or the suspension agreement,
 (C) whether the industry is vulnerable to material injury if the order is revoked or the suspension agreement is terminated, and
 (D) in an antidumping proceeding under section 1675(c) of this title, the findings of [Commerce] regarding duty absorption under section 1675(a)(4) of this title.
 19 U.S.C. § 1675a(a)(1) (2000).
 
 
 [6]
 19 C.F.R. § 351.213(j)(2) provides:
 (j) Absorption of antidumping duties.
 (1) During any administrative review covering all or part of a period falling between the first and second or third and fourth anniversary of the publication of an antidumping order under § 351.211, or a determination under § 351.218(d) (sunset review), the Secretary, if requested ... will determine whether antidumping duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the United States through an importer that is affiliated with such exporter or producer....
 (2) For transition orders defined in section 751(c)(6) of the Act, the Secretary will apply paragraph (j)(1) of this section to any administrative review initiated in 1996 or 1998.
 
 
 [7]
 Antidumping Duty Orders: Ball Bearings and Cylindrical Roller Bearings, and Parts Thereof From Italy, 54 Fed.Reg. 20,903 (Dep't Commerce May 15, 1989).
 
 
 [8]
 Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Duty Administrative Reviews and Notice of Request for Revocation of an Order, 61 Fed.Reg. 31,506 (Dep't Commerce June 20, 1996) ("Notice of Initiation").
 
 
 [9]
 Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews, 62 Fed.Reg. 31,566 (Dep't Commerce June 10, 1997) ("Preliminary Results").
 
 
 [10]
 Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Administrative Reviews, 62 Fed.Reg. 54,043 (Dep't Commerce Oct. 17, 1997) ("Final Results").
 
 
 [11]
 At oral argument, the following exchange took place between the court and counsel for Commerce:
 THE COURT: "What is the ambiguous language... you're construing?"
 COMMERCE: "The ambiguity, if there is one, is the absence of language. There is no specific reference in subsection (a) to the transition orders, but the entire section clearly addresses a program establishing a new program of duty absorption and five year inquiries, and recognizing that there were antidumping orders in existence prior to the establishment of this program, and that this program needs to apply to the transition orders...."
 ....
 THE COURT: "There is no specific ambiguous language —"
 COMMERCE: "There is no specific ambiguous language. There is an absence of language. There is a gap that needs to be filled if one wants to read it so restrictively as not applying to transition orders."
 
 
 [12]
 Section 1675(a)(1)(B) provides that, "[a]t least once during each 12-month period beginning on the anniversary of the date of publication of ... an antidumping duty order," Commerce shall "review and determine... the amount of any antidumping duty." 19 U.S.C. § 1675(a)(1)(B) (2000). Section 1675(a)(2) governs the "[d]etermination of antidumping duties," and provides:
 For the purpose of paragraph (1)(B), [Commerce] shall determine (i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry.
 19 U.S.C. § 1675(a)(2)(A) (2000).
 
 
 [13]
 Torrington argues for an even broader interpretation, urging that Commerce has authority to conduct duty absorption inquiries every second and fourth year aftereach successive sunset review of all orders that survive the initial sunset review. Torrington Br. at 29. We reject this theory. Neither the statute nor its legislative history suggests that Commerce may conduct duty absorption inquiries beyond the initial sunset review, and the plain language of the statute provides that duty absorption inquiries be conducted "2 years or 4 years after the publication of an antidumping duty order...." 19 U.S.C. § 1675(a)(4) (2000).
 
 
 [14]
 Even though Commerce's regulations are inapplicable here, we have held that Commerce's administrative determinations are entitled toChevron deference. Koyo Seiko Co. v. United States, 258 F.3d 1340, 1346-47 (Fed. Cir.2001).
 
 
 [15]
 Contrary to Torrington's argument that we should disregard the statutory language because it merely reflects a drafting error resulting from the pressures of fast-track legislation, this is not one of those rare situations in which statutory language can be ignoredSee Chickasaw Nation v. United States, 534 U.S. 84, 122 S.Ct. 528, 535, 151 L.Ed.2d 474 (2001).
 
 
 [16]
 Torrington argues that the duty absorption provisions were enacted to address specific concerns of American producers subject to sunset reviews arising from transition orders, and that Congress therefore must have intended for Commerce to conduct duty absorption inquiries of transition orders as well as new orders, citing testimony of domestic industry before the House Ways and Means Committee. Torr. Br. at 24-25. We doubt that such testimony, even if it existed, would carry much, if any, weight. In any event, the cited testimony relates to the industry's general concerns about duty absorption, and our attention has been drawn to no reference where that testimony focused on duty absorption inquiries specifically with respect to transition orders
 
 
 [17]
 The Statement of Administrative Action stated: "New section [1675](c)(6)(A) establishes a schedule for completing five year reviews of transition orders in a timely and efficient manner."SAA at 882, reprinted in 1994 U.S.C.C.A.N. at 4208.
 
 
 [18]
 Our decision today is quite consistent with our prior decisions inAmbassador Division of Florsheim Shoe v. United States, 748 F.2d 1560 (Fed.Cir.1984), and Smith-Corona Group v. United States, 713 F.2d 1568 (Fed. Cir.1983), and the District of Columbia Circuit's decision in Mobile Communications Corp. of America v. FCC, 77 F.3d 1399 (D.C.Cir.1996), cert. denied, 519 U.S. 823, 117 S.Ct. 81, 136 L.Ed.2d 38 (1996). In those cases the agency had general authority to act, and the sole question was whether statutory limitations denied authority. See Ambassador, 748 F.2d at 1561-62 (finding that section governing review of countervailing duty orders broadly authorized Commerce to suspend liquidation of those orders); Smith-Corona, 713 F.2d at 1575-76 (finding that "the statute does vest broad discretion in the Secretary" to determine price adjustments, and that "[t]he statute does not expressly limit the exercise of the Secretary's authority"); Mobile Communications, 77 F.3d at 1404-07 (finding that broad authority in statute's "necessary and proper clause" authorized FCC to require licensee to pay discounted price). The existence of limitations on specific authority have been held not to deny authority under more general provisions. See Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co., 534 U.S. 327, 122 S.Ct. 782, 789-90, 151 L.Ed.2d 794 (2002), discussed below. Here, the agency lacks general authority to act. Commerce also relies on Daewoo Electronics Co. v. International Union of Electronic, Electrical, Technical, Salaried & Machine Workers, 6 F.3d 1511, 1520-23 (Fed.Cir.1993), cert. denied, 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994). Daewoo was a case in which the agency limited its authority beyond what the statute might be read to require — not a situation in which the agency expanded its authority beyond the statute.
 
 
 
 50
 MICHEL, Circuit Judge, concurring-in-part and dissenting-in-part.
 
 
 51
 I believe the correct construction of the antidumping laws, reading as a whole the Uruguay Round Agreements Act ("URAA") amendments, is one in which duty absorption inquiries performed under § 1675(a)(4) apply to the five-year sunset reviews of transition orders. Because I cannot agree that logic permits an opposite conclusion, I respectfully dissent from that portion of the majority opinion that holds Commerce lacked the power to conduct the duty absorption inquiries as requested in this case.
 
 
 52
 According to § 291 of the URAA, the amendments made to the antidumping law "shall take effect on [January 1, 1995] and apply with respect to — ... (2) reviews initiated under [§ 1675](A) by the administering authority or the Commission on their own initiative after such date, or (B) pursuant to a request filed after such date." See 19 U.S.C. § 1671 note (quoting URAA § 291 (emphasis added)).[19] The five-year sunset review at issue in this case was initiated after January 1, 1995, so the amendments to the antidumping law apply in this case, even though the order was published pre-URAA. The purpose of five-year sunset reviews is to determine whether revocation of the particular antidumping duty order at issue "would be likely to lead to continuation or recurrence" of material injury to domestic firms. 19 U.S.C. § 1675(c). Section 1675a(a), governing the procedure to be followed for making such a determination, states on its face that "[t]he Commission shall take into account ... (D) in an antidumping proceeding under section 1675(c) of this title, the findings of the administering authority regarding duty absorption under section 1675(a)(4) of this title." 19 U.S.C. § 1675a(a)(1) (emphasis added). Indisputably, transition orders are antidumping proceedings under § 1675(c). See 19 U.S.C. § 1675(c)(6).
 
 
 53
 When interpreting statutes, our task is to construe what Congress has enacted beginning with the language of the statute itself, giving effect — if at all possible — to every clause and word of the statute. Duncan v. Walker, 533 U.S. 167, 172, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). We read statutes not in isolation but as a whole, United States v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984), settling on a construction that reduces terms to surplusage only where we can find no other reasonable reading of the statute. See Chickasaw Nation v. United States, 534 U.S. 84, ___, 122 S.Ct. 528, 532, 151 L.Ed.2d 474 (2001). Furthermore, where our construction involves multiple statutory sections that were enacted simultaneously as part of the same Act, "the duty to harmonize them is particularly acute." U.S. West Communications, Inc. v. Hamilton, 224 F.3d 1049, 1053 (9th Cir.2000) (citing Erlenbaugh v. United States, 409 U.S. 239, 244, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972)); accord Ambassador Div. of Florsheim Shoe v. United States, 748 F.2d 1560, 1565 (Fed.Cir.1984) (explaining that when different statutory sections are enacted in pari materia, "a legislative intent to have them work harmoniously together, and for neither to frustrate the other, or partially repeal it, is very much to be inferred"). With fidelity to these maxims, the majority concedes "we would have a very different case" if its interpretation of the statute rendered any relevant provision meaningless. I believe that this is indeed that very different case.
 
 
 54
 As part of the amendments under the URAA, Congress provided that Commerce "if requested, shall determine" whether duty absorption has occurred. 19 U.S.C. § 1675(a)(4). The purpose of Commerce's inquiry was manifest: an affirmative finding of duty absorption in years two or four places importers on notice that, should the practice continue, they would face increased difficulty in obtaining a revocation or termination of existing orders at their five-year sunset review. See Uruguay Round Agreements Act Statement of Administrative Action at 885-88, reprinted in 1994 U.S.C.C.A.N. 4040, 4210-11. To that end, the amendments affirmatively require Commerce to report those findings to the Commission: "The administering authority [Commerce] shall notify the Commission of its findings regarding such duty absorption for the Commission to consider in conducting a review under subsection (c) of this section." 19 U.S.C. § 1675(a)(4) (emphasis added). Again, that transition orders are subject to five-year sunset reviews under subsection (c) is not disputed, either by the parties or the majority.
 
 
 55
 Nevertheless, the majority opines that it "cannot speculate" how such reviews "would serve Congress's purpose where Congress did not authorize such reviews [i.e., duty absorption inquiries] for transition orders." This begs the question — whether Congress authorized duty absorption inquiries for transition orders — and at the same time pays only lip-service to our maxims of statutory construction. We are duty-bound to construe sections 1675(a)(4), 1675(c), and 1675a(a)(1) harmoniously, if at all possible. These sections are easily reconcilable once one recognizes that each sunset review of a duty order must consider duty absorption inquiries if such inquiries have been performed, that transition orders are subject to sunset reviews, and therefore, sunset reviews of transition orders necessarily must consider duty absorption inquiries provided that such inquiries have been performed. One need not look beyond the face of the statute to reach this conclusion, a necessary consequence of which is that, regardless of whether in a specific case an inquiry was actually performed, the possibility for the Commission to review such an inquiry must always exist. However, no such possibility exists under the court's reasoning.
 
 
 56
 The majority, deeming itself duty-bound not to "rewrite" the statute to include language that is already reasonably inferable from reading the statute as a whole, instead opts to read out (or, at a minimum, render meaningless) language expressly contained in the statute: the express, affirmative command to the Commission under § 1675a(a)(1) that it consider, during sunset reviews of transition orders, any findings that have been made under § 1675(a)(4). Recognizing this "minor anomaly," the majority attempts to justify it by speculating that § 1675a(a)(1) "must refer only to the situation in which duty absorption inquiries in fact exist." Such conjecture buckles under its own weight, however, as today's holding precludes the very existence of such a situation.[20]
 
 
 57
 Because duty absorption inquiries form a part of the core analysis in determining whether revocation of the antidumping duty order would be likely to lead to continuation or recurrence of material injury to domestics, the antidumping statute provides that they shall be considered by the Commission during sunset reviews of antidumping proceedings under § 1675(c). Transition orders are antidumping proceedings under § 1675(c). And because reviews at issue in this case were initiated after January 1, 1995, the URAA amendments to the antidumping statute govern this case. Therefore, in light of the entire statutory scheme, I believe that Congress intended such inquiries to apply to transition orders. To the extent the majority concludes otherwise, I respectfully dissent.
 
 
 
 Notes:
 
 
 [19]
 The majority notes that theSKF USA court found that URAA § 291 "provided an `unambiguous directive from Congress' that the section must be applied prospectively." Ante at 813. That is true — as to reviews. Section 291 plainly states that the effective date covers all reviews under § 1675 after January 1, 1995.
 
 
 [20]
 Duty absorption inquiries did not exist before the URAA amendments, and today's holding (1) rejects Commerce's argument that it has plenary power to conduct the reviews; (2) precludes duty absorption inquiries in years 1996 and 1998; and (3) precludes duty absorption inquiries in the second and fourth years leading up to any subsequent sunset review,see ante at 815 n. 13. Thus, no inquiry for a transition order would ever exist in fact. Although the court leaves open the question whether Commerce might initiate its own inquiry during the sunset review, such a scenario is decidedly at odds with: (1) § 1675(a)(4)'s requirement that Commerce perform an inquiry "if requested"; (2) the requirement that the Commission review "findings ... under § 1675(a)(4)"; and (3) the court's holding that Commerce lacks plenary authority to initiate sua sponte such a request in years two and four.